### FEDERAL TRADE COMMISSION *v.* R. F. KEPPEL & BRO., INC.

No. 194. Argued January 11, 1934.—Decided February 5, 1934.

*Assistant Attorney General Stephens,* with whom *Solicitor General Biggs* and *Messrs. Hammond E. Chaffetz, Robert E. Healy,* and *James W. Nichol* were on the brief, for petitioner.

*Mr. George E. Elliott,* with whom *Mr. Harris C. Arnold* was on the brief, for respondent.

MR. JUSTICE STONE delivered the opinion of the Court.

This case comes here on certiorari to review a decree of the Court of Appeals for the Third Circuit, which set aside an order of the Federal Trade Commission forbidding certain trade practices of respondent as an unfair method of competition. 63 F. (2d) 81; § 5, Federal Trade Commission Act, 38 Stat. 717, 719.

The Commission found that respondent, one of numerous candy manufacturers similarly engaged, manufactures, sells and distributes, in interstate commerce, package assortments of candies known to the trade as "break and take" packages, in competition with manufacturers of assortments known as "straight goods" packages. Both types are assortments of candies in packages in convenient arrangement for sale by the piece at a small price

in retail stores in what is known as the penny candy trade. The break and take assortments are so arranged and offered for sale to consumers as to avail of the element of chance as an inducement to the retail purchasers. One assortment, consisting of 120 pieces retailing at 1 cent each, includes four pieces, each having concealed within its wrapper a single cent, so that the purchasers of those particular pieces of candy receive back the amount of the purchase price and thus obtain the candy without cost. Another contains 60 pieces of candy, each having its retail price marked on a slip of paper concealed within its wrapper; 10 pieces retail at 1 cent each, 10 at 2 cents, and 40 at 3 cents. The price paid for each piece is that named on the price ticket, ascertained only after the purchaser has selected the candy and the wrapper has been removed. A third assortment consists of 200 pieces of candy, a few of which have concealed centers of different colors, the remainder having white centers. The purchasers of the candy found to have colored centers are given prizes, packed with the candy, consisting of other pieces of candy or a package containing lead pencils, penholder and ruler. Each assortment is accompanied by a display card, attractive to children, prepared by respondent for exhibition and use by the dealer in selling the candy, explaining the plan by which either the price or the amount of candy or other merchandise which the purchaser receives is affected by chance. The pieces of candy in the break and take packages are either smaller than those of the competing straight goods packages, which are sold at a comparable price without the aid of any chance feature, or they are of inferior quality. Much of the candy assembled in the break and take packages is sold by retailers, located in the vicinity of schools, to school children.

The Commission found that the use of the break and take package in the retail trade involves the sale or dis-

tribution of the candy by lot or chance; that it is a lottery or gambling device which encourages gambling among children; that children, enticed by the element of chance, purchase candy so sold in preference to straight goods candy; and that the competition between the two types of package results in a substantial diversion of trade from the manufacturers of the straight goods package to those distributing the break and take type. It found further that in some states lotteries and gaming devices are penal offenses; that the sale or distribution of candy by lot or chance is against public policy; that many manufacturers of competing candies refuse to engage in the distribution of the break and take type of package because they regard it as a reprehensible encouragement of gambling among children; and that such manufacturers are placed at a disadvantage in competition. The evidence shows that others have reluctantly yielded to the practice in order to avoid loss of trade to their competitors.

The court below held, as the respondent argues here, that respondent's practice does not hinder competition or injure its competitors, since they are free to resort to the same sales method; that the practice does not tend to create a monopoly or involve any deception to consumers or the public, and hence is not an unfair method of competition within the meaning of the statute.

Upon the record it is not open to question that the practice complained of is a method of competition in interstate commerce and that it is successful in diverting trade from competitors who do not employ it. If the practice is unfair within the meaning of the Act, it is equally clear that the present proceeding, aimed at suppressing it, is brought, as § 5 of the Act requires, " to the interest of the public." The practice is carried on by forty or more manufacturers. The disposition of a large number of complaints pending before the Commission,

similar to that in the present case, awaits the outcome of this suit. Sales of the break and take package by respondent aggregate about $234,000 per year. The proceeding involves more than a mere private controversy. A practice so generally adopted by manufacturers necessarily affects not only competing manufacturers but the far greater number of retailers to whom they sell, and the consumers to whom the retailers sell. Thus the effects of the device are felt throughout the penny candy industry. A practice so widespread and so far reaching in its consequences is of public concern if in other respects within the purview of the statute. *Federal Trade Comm'n* v. *Royal Milling Co.*, 288 U.S. 212, 216. Compare *Federal Trade Comm'n* v. *Klesner*, 280 U.S. 19, 28. Hence we pass without further discussion to the decisive question whether the practice itself is one over which the Commission is given jurisdiction because it is unfair.

Although the method of competition adopted by respondent induces children, too young to be capable of exercising an intelligent judgment of the transaction, to purchase an article less desirable in point of quality or quantity than that offered at a comparable price in the straight goods package, we may take it that it does not involve any fraud or deception. It would seem also that competing manufacturers can adopt the break and take device at any time and thus maintain their competitive position. From these premises respondent argues that the practice is beyond the reach of the Commission because it does not fall within any of the classes which this Court has held subject to the Commission's prohibition. See *Federal Trade Comm'n* v. *Gratz*, 253 U.S. 421, 427; *Federal Trade Comm'n* v. *Beech-Nut Packing Co.*, 257 U.S. 441, 453; *Federal Trade Comm'n* v. *Raladam Co.*, 283 U.S. 643, 652; *Federal Trade Comm'n* v. *Royal Milling Co., supra,* at 217. But we cannot say that the Com-

mission's jurisdiction extends only to those types of practices which happen to have been litigated before this Court.

Neither the language nor the history of the Act suggests that Congress intended to confine the forbidden methods to fixed and unyielding categories. The common law afforded a definition of unfair competition and, before the enactment of the Federal Trade Commission Act, the Sherman Act had laid its inhibition upon combinations to restrain or monopolize interstate commerce which the courts had construed to include restraints upon competition in interstate commerce. It would not have been a difficult feat of draftsmanship to have restricted the operation of the Trade Commission Act to those methods of competition in interstate commerce which are forbidden at common law or which are likely to grow into violations of the Sherman Act, if that had been the purpose of the legislation.

The Act undoubtedly was aimed at all the familiar methods of law violation which prosecutions under the Sherman Act had disclosed. See *Federal Trade Comm'n v. Raladam Co., supra,* 649, 650. But as this Court has pointed out it also had a broader purpose, *Federal Trade Comm'n v. Winsted Hosiery Co.,* 258 U.S. 483, 493; *Federal Trade Comm'n v. Raladam Co., supra,* 648. As proposed by the Senate Committee on Interstate Commerce and as introduced in the Senate, the bill which ultimately became the Federal Trade Commission Act declared "unfair competition" to be unlawful.[1] But

---

[1] The Senate Committee on Interstate Commerce, in recommending the bill in its original form, seems to have adopted the phrase "unfair competition" with the deliberate purpose of giving to the Commission some latitude for dealing with new and varied forms of unfair trade practices. The Committee said in its report of June 13, 1914, Senate Report No. 597, 63d Cong., Second Session, page 13:

it was because the meaning which the common law had given to those words was deemed too narrow that the broader and more flexible phrase " unfair methods of com-

" The committee gave careful consideration to the question as to whether it would attempt to define the many and variable unfair practices which prevail in commerce and to forbid their continuance or whether it would, by a general declaration condemning unfair practices, leave it to the commission to determine what practices were unfair. It concluded that the latter course would be the better, for the reason, as stated by one of the representatives of the Illinois Manufacturers' Association, that there were too many unfair practices to define, and after writing 20 of them into the law it would be quite possible to invent other others.

" It is believed that the term ' unfair competition ' has a legal significance which can be enforced by the commission and the courts, and that it is no more difficult to determine what is unfair competition than it is to determine what is a reasonable rate or what is an unjust discrimination. The committee was of the opinion that it would be better to put in a general provision condemning unfair competition than to attempt to define the numerous unfair practices, such as local price cutting, interlocking directorates, and holding companies intended to restrain substantial competition."

Senator Newlands, in introducing the bill for the Committee, emphasized this feature. In answering the criticism that the phrase " unfair competition " lacked definition he said, 51 Cong. Rec. 11084:

" Our answer to this is that it would be utterly impossible for Congress to define the numerous practices which constitute unfair competition and which are against good morals in trade, for we are beginning to realize that there is a standard of morals in trade or that there ought to be. Germany does not hesitate by law to condemn practices in business that are *contra bonos mores*. It leaves their tribunals to determine what practices are against good morals.

" It is the illusive character of the trade practice that makes it though condemned today appear in some other form tomorrow. If we should attempt to define all the trade practices that can be devised, that would create dishonest advantage in competition, we would undertake a hopeless task."

petition" was substituted.[2]  Congress, in defining the powers of the Commission, thus advisedly adopted a phrase which, as this Court has said, does not "admit of precise definition but the meaning and application of which must be arrived at by what this Court elsewhere has called 'the gradual process of judicial inclusion and exclusion.'" *Federal Trade Comm'n* v. *Raladam Co., supra,* 648; compare *Davidson* v. *New Orleans,* 96 U.S. 97, 104.[3]

The argument that a method used by one competitor is not unfair if others may adopt it without any restriction of competition between them was rejected by this Court in *Federal Trade Comm'n* v. *Winsted Hosiery Co., supra;* compare *Federal Trade Comm'n* v. *Algoma Lumber Co., ante,* p. 67.  There it was specifically held that a

---

[2] The phrase "unfair methods of competition" was substituted for "unfair competition" in the Conference Committee.  This change seems first to have been suggested by Senator Hollis in debate on the floor of the Senate in response to the suggestion that the words "unfair competition" might be construed as restricted to those forms of unfair competition condemned by the common law.  51 Cong. Rec. 12145.  The House Managers of the conference committee, in reporting this change, said, House Report No. 1142, 63d Congress, 2d Sess., September 4, 1914, at page 19:

"It is impossible to frame definitions which embrace all unfair practices.  There is no limit to human inventiveness in this field.  Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again.  If Congress were to adopt the method of definition, it would undertake an endless task.  It is also practically impossible to define unfair practices so that the definition will fit business of every sort in every part of this country.  Whether competition is unfair or not generally depends upon the surrounding circumstances of the particular case.  What is harmful under certain circumstances may be beneficial under different circumstances."

[3] References showing the details of the legislative history of the Act may be found in Handler, The Jurisdiction of the Federal Trade Commission over False Advertising, 31 Col.L.Rev. 527; Montague, Unfair Methods of Competition, 25 Yale L.J. 20; Henderson, The Federal Trade Commission, c. I.

trader may not, by pursuing a dishonest practice, force his competitors to choose between its adoption or the loss of their trade. A method of competition which casts upon one's competitors the burden of the loss of business unless they will descend to a practice which they are under a powerful moral compulsion not to adopt, even though it is not criminal, was thought to involve the kind of unfairness at which the statute was aimed.

The practice in this case presents the same dilemma to competitors, and we can perceive no reason for distinguishing between the element of chance as employed here and the element of deception involved in labelling cotton goods " Natural Wool," as in the *Winsted* case. It is true that the statute does not authorize regulation which has no purpose other than that of relieving merchants from troublesome competition or of censoring the morals of business men. But here the competitive method is shown to exploit consumers, children, who are unable to protect themselves. It employs a device whereby the amount of the return they receive from the expenditure of money is made to depend upon chance. Such devices have met with condemnation throughout the community. Without inquiring whether, as respondent contends, the criminal statutes imposing penalties on gambling, lotteries and the like, fail to reach this particular practice in most or any of the states, it is clear that the practice is of the sort which the common law and criminal statutes have long deemed contrary to public policy. For these reasons a large share of the industry holds out against the device, despite ensuing loss in trade, or bows reluctantly to what it brands unscrupulous. It would seem a gross perversion of the normal meaning of the word, which is the first criterion of statutory construction, to hold that the method is not " unfair." See *Federal Trade Comm'n* v. *Royal Milling Co., supra,* at 217; *Federal Trade Comm'n* v. *Algoma Lumber Co., supra,* at 81.

While this Court has declared that it is for the courts to determine what practices or methods of competition are to be deemed unfair, *Federal Trade Comm'n* v. *Gratz, supra*, in passing on that question the determination of the Commission is of weight. It was created with the avowed purpose of lodging the administrative functions committed to it in " a body specially competent to deal with them by reason of information, experience and careful study of the business and economic conditions of the industry affected," and it was organized in such a manner, with respect to the length and expiration of the terms of office of its members, as would " give to them an opportunity to acquire the expertness in dealing with these special questions concerning industry that comes from experience." Report of Senate Committee on Interstate Commerce, No. 597, June 13, 1914, 63rd Cong., 2d Sess., pp. 9, 11. See *Federal Trade Comm'n* v. *Beech-Nut Packing Co., supra*, at 453; compare *Illinois Central R. Co.* v. *Interstate Commerce Comm'n*, 206 U.S. 441, 454. If the point were more doubtful than we think it, we should hesitate to reject the conclusion of the Commission, based as it is upon clear, specific and comprehensive findings supported by evidence.

We hold that the Commission correctly concluded that the practice was an unfair method of competition within the meaning of the statute. It is unnecessary to attempt a comprehensive definition of the unfair methods which are banned, even if it were possible to do so. We do not intimate either that the statute does not authorize the prohibition of other and hitherto unknown methods of competition or, on the other hand, that the Commission may prohibit every unethical competitive practice regardless of its particular character or consequences. New or different practices must be considered as they arise in the light of the circumstances in which they are employed.

*Reversed.*