**MINTER et al. v. FEDERAL TRADE COMMISSION.**

**No. 6795.**

Circuit Court of Appeals, Third Circuit.

Feb. 14, 1939.

David H. Kinley, of Philadelphia, Pa., for petitioners.

W. T. Kelley, Chief Counsel, Federal Trade Commission, Martin A. Morrison, Ass't. Chief Counsel, and James W. Nichol, Sp. Atty., all of Washington, D. C., for respondent.

Before BIGGS, CLARK, and BUFFINGTON, Circuit Judges.

CLARK, Circuit Judge.

This case seems to us a futile continuation of earlier litigation. The trade practices of these petitioners have already been expressly condemned in a unanimous opinion of the United States Supreme Court, Federal Trade Commission v. Keppel & Bro., 291 U.S. 304, 54 S.Ct. 423, 78 L.Ed. 814, February 5, 1934. As the high court there adopted, or rather amplified, the view of the then minority of this court, we can be supposed to be thoroughly familiar with the holding.

The particular practice whose ceasing and desisting was there and here ordered is known in the marts of commerce as selling by "break and take" (pick and take, draw deals, punch cards and punch boards) rather than by "straight goods" packages. The nomenclature furnishes a clue to the disapproval both of the judicial bodies and encouragingly, of the "better element" in the trade itself.

The "break and take" method is the sale of merchandise (or amusement as in the case of motion picture bank nights, 12 Wisconsin Law Review 251, 17 Boston University Law Review 238), by the inducement of a lottery. The customer does not buy only a chance represented by a ticket, he pays for a chattel and a chance for another unpaid chattel, the ticket being the opportunity for fortuitous selection of a differentiated article. It is, so to speak, a lottery with trimmings, and one might observe that a lottery by any other name will smell as bad.

This selling by lottery seems to have prevailed largely where it least should have prevailed, namely, in the sale of penny candy to little children. The Federal Trade Commission's brief cites eighteen of these candy cases initiated by it and sustained by the Circuit Courts of Appeal and the United States Supreme Court since the decision of the Keppel case above cited. These cases are collected in the notes to Section 45 of Title 15, U.S.C.A. on pages 66–75 of the supplement, and see note 5 of 43 Yale Law Journal 1339. See also In the matter of Boyd Houser Candy Company and In the matter of The Newton Products Com-

pany, Vol. 4 Federal Register, No. 27, p. 607. It has not always been so limited. As long ago as 1918 we find the Federal Trade Commission prohibiting the sale of tea and coffee with coupons for prizes concealed in certain packages, Federal Trade Comm. v. Brumage-Loeb Co., Successor to Buddha Tea Co., 1918, 1 F.T.C. 159, Federal Trade Comm. v. Everybody's Mercantile Co., 1920, 3 F.T.C. 60, and only recently the commission was sustained in its objection to the sale of silk stockings by punch cards, Chicago Silk Co. v. Federal Trade Commission, 7 Cir.1937, 90 F.2d 689, certiorari denied, 1938, 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582. And see also as to the sale of gas and oil an injunction by competitor, Jones v. Smith Oil & Refining Co., 1938, 295 Ill. App. 519, 15 N.E.2d 42; 29 Journal of Criminal Law and Criminology 598.

The petitioners and the other practitioners of this type of merchandising have followed that ancient precept of the sea, "women and children first", except that they pervert instead of protect weakness. Taking candy from children has never been highly regarded. Forcing it upon them through their possession of an instinct that the adult world recognizes and has always recognized as at the bottom of many of its troubles, seems to us shameful. We have rarely seen of a more unpleasant example of commercial cynicism than is disclosed by the testimony of the petitioners' president, Ira W. Minter:

"Q. In your opinion, Mr. Minter, is this form of advertising injurious to the public? A. The public benefits by it.

"Q. In what way would you say the public benefits by it? A. By getting additional value for the purchase of the particular goods that it is being offered with". Record, p. 148.

The "benefit" and "additional value" so euphemistically referred to, is our old friend "something for nothing", the consequences of too enthusiastic pursuit of which are known to judges in their official capacities.

■ In view of the controlling decision of the Supreme Court in Federal Trade Commission v. Keppel & Bro., above cited, any extended discussion of the law is inappropriate. Petitioners attempt three distinctions. Two of them touch upon the judicial history of its interpretation. They say, first, that the Federal Trade Commission has no statutory power because the whole candy manufacturing business is infected with the "break and take" virus. In the light of the sentiments we have just expressed, we

should be loath to believe this of any body of business men. Happily we do not have to. First, the witnesses making this depressing assertion, Minter and Coughlin, the president and candy broker of the petitioners, are somewhat interested. Second, it is flatly contradicted by two other candy manufacturers called by the Commission, Voneiff, p. 39, and Roskamm, p. 102. Although the latter's business reformation was not altogether voluntary (cease and desist order), he did not limit himself to his own business but referred to earlier and, to him, more Halcyon days in the trade generally, saying: "In the days when break and take were so actively sold in a much larger volume than they are today; we used to receive constant requests from our salesmen, wanting to know why, if other firms could make these packages, we would not make them, and advised us that in many instances their customers were buying a general line of merchandise such as ours, from sources who could supply them with break and take, and vigorously demanded therefore that we also give them a similar assortment to do business with so that they can get their normal share of the distribution and earn their pro rata commission". Record, p. 102.

■ The Commission's finding, paragraph 6, Record pp. 200–201 is supported by evidence and is by well-settled law conclusive, Federal Trade Commission v. Algoma Lumber Co., 291 U.S. 67, 73, 54 S.Ct. 315, 78 L. Ed. 655, January 8, 1934, Federal Trade Commission v. Standard Education Society, 302 U.S. 112, 117, 58 S.Ct. 113, 82 L.Ed. 141, November 8, 1937.

Even if this had not been so and if the entire penny candy trade had indulged in the practice alleged to be obnoxious, we believe the present trend of decision under section 45, Title 15, U.S.C.A., supports the order. That trend is away from the requirement of injury to a particular competitor and toward the protection of the general consumer.

The direction of that judicial current depends, of course, upon the construction of a very general word "competition". The issue is whether it may be construed to include situations where the practices to be struck down are rife in an entire industry, Jurisdiction of Federal Trade Commission Over False Advertising, 31 Col.Law Rev. 527, or whether the Commission can only intervene when one honest competitor enters the field, Scope of the Jurisdiction of the Federal Trade Commission over False and Misleading Advertising, 40 Yale Law

Journal 617 (comment), The Meaning of Methods of Competition in Commerce, 31 Michigan Law Review 808.

Light has, very properly, been sought in the halls of Congress. An entire article has been devoted to a collection of excerpts from the Debates in the Senate, Unfair Methods of Competition, 25 Yale Law Journal 20, and further references to the Congressional Debates are collected in note 18 on page 532 of Mr. Handler's (a leading authority on the subject) article in 31 Col. Law Review 534, above cited. A perusal of these debates leaves us with the impression that general words were employed to make possible the meeting of future contingencies. We say this although we recognize the danger voiced by Mr. Justice Cardozo in repeating the words of Professor Gray in his lectures on the Nature and Sources of the Law: " 'that the difficulties of so-called interpretation arise when the legislature has had no meaning at all; when the question which is raised on the statute never occurred to it; when what the judges have to do is, not to determine what the legislature did mean on a point which was present to its mind, but to guess what it would have intended on a point not present to its mind, if the point had been present' ". Cardozo, The Nature of the Judicial Process, p. 15.

Surely emasculation of the Commission in proportion to the prevalence of the roguery involved would be a failure to recognize such contingency. The contrary or strict construction by some of the courts arises, as we think, from too long judicial considerations of the technical difficulties in the enforcement of common law private and public sanctions against dishonest trade practices, Handler, False and Misleading Advertising, 39 Yale Law Journal 22, The Meaning of Methods of Competition in Commerce, 31 Michigan Law Review 808, above cited, Handler, Jurisdiction of Federal Trade Commission over False Advertising, 31 Col.Law Review 527, above cited, Scope of the Jurisdiction of the Federal Trade Commission over False and Misleading Advertising, 40 Yale Law Journal 617 (comment), above cited.

It is not unreasonable to suppose that the very purpose of the legislative body, here as often, was to stop the gaps of judge made law. If we can indulge in a priori reasoning, we might note the addition by Congress on June 23, 1938 of the phrase "unfair or deceptive acts or practices in commerce" to the former "unfair methods of competition in commerce", 52 Stat. 1028, 15 U.S.C.A. § 45.

Petitioners' second ground for distinguishing the Keppel case opens up another vista of interpretation as to the meaning of another general word—this time the word "unfair". Here again and again naturally the effort is toward limitation. The rugged individual wishes to continue in his ruggedness and wishes to correspondingly narrow the scope of interference by a bureaucratic and possibly slightly more ethical government. The courts have not agreed with their rugged view, however, and have gradually widened that scope. They have brought their standard of fairness even closer to an ever, we think, higher conception of business ethics. That process of widening is discussed in the law review articles above cited, 39 Yale Law Journal 22, 31 Michigan Law Review 808, 31 Col.Law Review 527, 40 Yale Law Journal 617. See also The Legal Phases of Advertising by Francis Finkelhor, 1938.

The distinction attempted is based on a difference of fact. In the Keppel case the candy of the break and take package was of inferior quality to that of the straight goods. Here it is not. The argument seems to be derived from the attempt of the dissenting opinion of this court, Keppel & Bro. v. Federal Trade Commission, 3 Cir., 63 F.2d 81, 85, to bring the practice within the conception of "deception".

The learned judge of this Court writing that opinion concludes that driving the non-gambling packages from the shelves forced cheating of the consuming children. This stretching of logic was, we surmise, occasioned by a desire to bring the case within the established precedents which stressed deception.

The Supreme Court, as is its special privilege, rejected this, shall we say, rather tortured construction of the practice and placed its decision on a more satisfactory legal and a more fundamental ethical ground. If you cheat people, you affect their pocketbook; if you encourage them to gamble, you affect their character. Mr. Justice Stone said: "But here the competitive method is shown to exploit consumers, children, who are unable to protect themselves. It employs a device whereby the amount of the return they receive from the expenditure of money is made to depend upon chance. Such devices have met with condemnation throughout the community. Without inquiring whether, as respondent

contends, the criminal statutes imposing penalties on gambling, lotteries and the like, fail to reach this particular practice in most or any of the states, it is clear that the practice is of the sort which the common law and criminal statutes have long deemed contrary to public policy. For these reasons a large share of the industry holds out against the device, despite ensuing loss in trade, or bows reluctantly to what it brands unscrupulous. It would seem a gross perversion of the normal meaning of the word, which is the first criterion of statutory construction, to hold that the method is not 'unfair.'" Federal Trade Commission v. Keppel & Bro., 291 U.S. 304, 313, 54 S.Ct. 423, 426, 78 L.Ed. 814.

The writer of a note in the Yale Law Journal has commented on this opinion, saying: "Granting that those practices which business men 'should not adopt' constitute unfair methods of competition, the question still remains as to why, in the face of a diversion of trade which might otherwise be retained, they should refuse to use the method involved in the principal case. The reason is found in the injury which its use will entail to the public. In the advertising cases, that injury consists of deception with the resultant purchase of a different and usually inferior article than is represented. In the case under consideration, while the deception element was lacking, still the consumers of the product were induced by the gaming device to purchase a product inferior to that which they might otherwise procure for the same price. But in the eyes of the Court the financial injury was subordinate to the moral one, which consisted of a tendency to encourage gambling, a form of conduct that it deemed subversive of general morality and so contrary to public policy as frequently to have been an object of statutory prohibition". Powers of the Federal Trade Commission in Prohibiting Unfair Methods of Competition, 43 Yale Law Journal 1338, 1340 (note). See also 10 N.Y.U.Law Quarterly Rev. 11, 82 U.Pa. Law Rev. 664, 665.

It is interesting to record that the business men responsible for the publication of that most excellent book, Public Regulation of Competitive Practices, had anticipated the sentiments of the learned Justice and the learned author. We quote:

"As a method of sales promotion, lotteries are so unusual as to warrant but passing notice. They are unusual because they were well known to be opposed to public policy even prior to the enactment of the regulatory legislation of 1914, and in some states they have been made penal offenses by statute. The reasons for this general condemnation of lotteries are primarily ethical and not economic. It is regarded as contrary to sound morality that men should be encouraged to seek 'something for nothing'—or for a trifle. At the same time it is recognized that there are economic objections to a scheme which extracts small contributions from many, without compensation, for the benefit of the chance recipient of an unearned prize". Pages 138–139.

"In other words an honest lottery as a method of promoting sales was held to constitute an unfair method of competition. This appears to be sound doctrine. If it is unfair competition to tempt buyers by misrepresentations of the quality of goods, it may be regarded as likewise unfair to tempt them to buy goods not upon their merits but upon the chance of securing something for nothing". Page 140.

As the United States Supreme Court in the Keppel case has rejected the petitioners' officers' tolerance toward children's lotteries, it is perhaps impertinent to indulge in any homily on the economics and ethics of gambling. The temptation and its cause have been eloquently described by Lecky: "The foregoing remarks will show the great difficulty and complexity of these questions about the connection between legislation and morals. Perhaps the most important and most difficult is the attitude the law should assume towards voluntary habits which are the cause of great and widespread misery in the community. One of the most conspicuous of these is gambling. * * * Yet no one will doubt that gambling may easily become a passion scarcely less irresistible and less injurious than drink, and it is a passion which is common to all latitudes and to all stages of civilisation. Probably its chief root is that craving for excitement to which I have just referred as one of the deepest and strongest springs of human action. Man is so constituted that tranquil pleasure rarely suffices him. There are chords in his being which must be touched in another way, and he imperiously needs the thrill of intense emotion, even when that emotion is far from being exclusively pleasurable." Democracy and Liberty, Vol. 2, Page 107. See also Hastings, Encyclopedia of Religion and Ethics, Vol. 3, p. 584, Encyclopedia of the Social Sciences, Vol. 6, p. 555, Keynes, Treatise on Probability, p. 20, p. 320.

The particular form of gambling in question here, the lottery, has come in for par-

ticular attention. Because of the ease of and profit in its operation, the lottery has had a long and international history and has been utilized for the support of the revenue and other beneficent purposes, Channing, History of the United States, Vol. 4, pp. 24–27, Vol. 5, pp. 197–200, The Reference Shelf, Muller, Lotteries, Vol. 10, No. 2. Its evil has been thus described: "The real objection to lotteries is that most of their patrons are poor people, who can ill afford the sums they spend. Their dreams of success, of sudden unearned riches, are the unhealthy dreams of the escapist who finds the burden of his normal existence almost insupportable. The lottery, in short, has the same weakness as the sales tax; it is a levy on those who can least afford it: it reduces the purchasing power of the poor, and the revenues that might be derived from it by the government would help reduce the tax burden on the rich". The Reference Shelf, Muller, Lotteries, Vol. 10, No. 2, pp. 103–104. And it is accurate, we think, to say that the number of lotteries and of those approving them in the world are on the decline. The Reference Shelf, Muller, Lotteries, Vol. 2, No. 2, Negative Discussion, p. 103.

However that may be, there is no doubt about the current attitude of our people, at least so far as it is reflected in their institutions, if not in their habits. By constitutional mandate four states forbid all forms of gambling, Index Digest of State Constitutions, The New York State Constitutional Convention Commission, 1915, p. 702, and thirty-three states forbid it in the form of lotteries, Index Digest of State Constitutions, above cited, p. 977. All attempts to repeal these provisions have failed, Proceedings of the New York State Constitutional Convention, 1938, Vol. 6, p. 200. The United States (Sections 191, 336, 387, Title 18, U.S.C.A., Sections 135, 136, Title 19, U.S.C.A.) and all forty-eight states have signified their legislative abhorrence of gambling by lottery, 38 C.J. 303.

██ More germane to the principal case is the position of our courts. We say more germane because we cannot overlook (as some people did in 1919) the difficulties inherent in the enforcement of sumptuary legislation. "It is necessary to lay the foundation of the public administration in the affections of the people". George Washington, Richardson, Messages and Papers of the Presidents (1789–1897) Vol. VI, p. 10; and see Lecky, above cited, pp. 106, 107. There is no such difficulty in the negative

act of failing to give effect to transactions deemed to be contrary to public policy. Although wagering contracts were valid at common law, in modern times, in both England and most of the states of the United States, gambling transactions are "unenforceable" and only the loser has recourse to the courts, 27 C.J. 1048, 1080.

In our opinion, the requirement that the trader cease and desist from making a profit out of a lottery is more analogous to this abstention of the courts than it is to positive punishment of the habits of a people. As a matter of fact, even a nation of adult bingo players (cf. testimony of petitioners' candy broker, Record p. 179) would acquiesce in the prevention of pandering to the same instinct in their young.

Such, at any rate, has been the attitude of the law makers from earliest times. So we find the Pandect providing: "It is determined that no one that has given money on loan to a filiusfamilias, to be paid even after the death of the parent in whose power he is, shall be given any action or claim, that so these money-lenders of the worst sort may know that no filiusfamilias can contract a debt that will be good in the event of his father's death". D. 14, 6, 1. This enactment "derived its name either from Macedo, a well-known usurer; or from Macedo, a young debauchee, whose crimes had drawn the attention of the Senate to the perils arising from spendthrift children", Tacitus, Ann. 11, 13, Suetonius, Vesp. 11. In England in 1541 an act prohibited lotteries because the young men spent their time gambling instead of practising archery, 29 Journal of Criminal Law and Criminology 598, above cited. Many states attach special criminal significance to the encouragement of gambling by minors, 21 Cent., Gaming, sec. 203, 20 Cyc., 909. This ancient and modern legislation is but the reflection of a general opinion. The editors of The School Review related it to the particular practices of the case at bar:

"Children as well as adults are today constantly being exposed to the lure of various types of gambling schemes. These are rapidly increasing in number. One can hardly drop into the corner store or stop on the road while driving without running into slot machines, punchboards, and pin-ball games. And how appealing to the eye and imagination the manufacturers have made these devices!

"The situation has reached such proportions that serious consideration must be giv-

en to an intelligent attack on the problem. The soundest protection of the individual against the gambling evil would seem to be found in an intelligent understanding of the truth. Children cannot be protected from the various gambling schemes so common today by merely allowing them to grow up in ignorance of the facts, in the hope that they will never come into contact with them. The truth of the matter is that they come into contact with them at an early age and learn about them through very undesirable experiences. Various gambling schemes are used at American Legion carnivals and even church bazaars. As if the end justified the means!

"In order to find out what proportion of our children had some experience with slot machines and punchboards, we checked the children in the eighth grade. We found that 93 pupils or 78 per cent of the class had played slot machines and 64 pupils or 52 per cent had played punchboards. With such proportions at the elementary-school level, what can we expect later on?

"The experiences of children with such devices are usually very inadequate and misleading. The unfortunate thing about gambling is the fact that people tend to forget their losses but always remember their 'winnings'. The thrill of winning makes a strong impression on the individual, and it remains in his memory. Then too it inflates his 'ego' to win, and he constantly reminds others of his 'good judgment'. The losses are not as clearly appreciated because usually no account is kept of the nickels or quarters squandered on the machines from time to time. The 'winnings', however, always come in one larger payment and greatly impress the individual. Have you ever heard people tell about their great losses? But you have heard them tell about their 'winnings'. As a result the impression grows that certain people are always lucky. Individuals themselves develop the attitude that they are just naturally lucky and can get something for nothing. This impression is particularly effective with children". An Instance of Realistic Civil Education, The School Review, February 1938, pp. 92, 93. See also Evans, Are We Teaching Our Children To Gamble?, Parents Magazine, March 1937, p. 24; Hauser, A Short Course in Gambling, Parents Magazine, June 1938, p. 31.

Petitioners seem to have had some realization of the reaction we have just been discussing. Their third ground of distinc-

tion from Federal Trade Commission v. Keppel & Bro. above cited, is the pretense that the candy does not reach the mouths of children. This assertion almost calls for the application of the Physical Facts Rule discussed in two recent opinions of this court. "The manufacturer puts up candy for sale to jobbers who sell to small neighborhood stores particularly those adjacent to schools", Witness, Roskamm, p. 98. Does petitioners' president envisage many of his grown-up friends and acquaintances gorging themselves on penny candy? If he does, we do not.

The petition for review is dismissed.