H. B. DEAL & COMPANY, INC., *v.* LEONARD.

4-7963                                    196 S. W. 2d 991

Opinion delivered October 21, 1946.
Rehearing denied November 18, 1946.

*Ezra Garner* and *Leo F. Laughren,* for appellant.

*Sam Goodkin, J. V. Spencer* and *L. B. Smead,* for appellee.

McHANEY, Justice. Appellant is a foreign corporation, authorized to do business in this state. Appellees, other than Leonard, are Charles E. May, Albert C. Merritt, Slim Upton, Aubrey O. Fielder and Clarence T. Key. They brought this action against appellant, under the provisions of the "Fair Labor Standards Act of 1938," U.S.C.A. Title 29, § 201 *et seq.,* as amended, to recover at the rate of time and one-half pay for all time worked by each of them in excess of 40 hours per week. They alleged in the complaint their employment by appellant in the construction of the Ozark Ordnance Works near El Dorado, Arkansas, which plant was designed and constructed by the U. S. Government for the manufacture of anhydrous ammonia and ammonium nitrate to be used in the manufacture of munitions of war, and which product was to be shipped by the Government outside the state of Arkansas; that they were employed by appellant to check and make records of incoming building material, supplies and equipment as they were unloaded from railroad cars or trucks moving in interstate commerce; that they were engaged in commerce or in the production of goods for commerce, within the meaning of said act as amended; that they were not paid for overtime for the hours worked in excess of 40 per week; and that appellant was indebted to them for such overtime pay. Appellant's answer admitted its corporate capacity, but denied all

other allegatons of the complant. In addition it alleged that it entered into a contract with the U. S. A. to perform certain services in connection with the construction of the Ozark Ordnance Works, hereinafter referred to as the Plant, and attached a copy of said contract as an exhibit to its answer; that under said contract appellees were employees of the U. S. A., and, as such, were exempt from the provisions of said Act; that neither of the appellees was engaged in commerce or in the production of goods for commerce, as alleged by them, but were engaged in a local matter; that the work of appellees as set out in the complaint was not in interstate commerce, as the materials and shipments had reached their point of destination in Arkansas, and had come to rest at and before the times appellees made the records mentioned in the complaint, and that said records were never the subject of interstate commerce; and that the material and equipment referred to in the complaint was the property of the U. S. A., and as such did not constitute interstate commerce, but that said shipments were administrative acts of the U. S. A. in the prosecution of a war.

By stipulation a jury was waived and the case was submitted to the court sitting as a jury. Trial resulted in findings and judgments in favor of appellees for overtime pay found to be due each of them, plus the same amount as liquidated damages, plus an attorney's fee in each case of $250. The total judgment in favor of each is as follows: For Leonard, $1,057.60; for Merritt, $672.22; for Fielder, $509.68; for Key, $728.62; for May, $563.10; and for Upton, $778.82. This appeal followed in due course.

The applicable provisions of the Fair Labor Standards Act, upon which the action is based, are: "Section 207 (a). No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce . . ."

"(3) For a work week longer than 40 hours . . . unless such employee received compensation for his employment in excess of the hours above specified at a

rate not less than one and one-half times the regular rate at which he is employed.

"Sec. 216 (b). Any employer who violates the provisions of . . . section 7 of this Act shall be liable to the employee or employees affected in the amount of . . . their unpaid overtime compensation . . . and in an additional equal amount as liquidated damages." The Act defines the words "commerce," "goods" and "produced" as follows:

"Sec. 203 (b). 'Commerce' means trade, commerce, transportation, transmission, or communication among the several states or from any state to any place outside thereof.

"(i). 'Goods' means goods (including ships and marine equipment), wares, products, commodities, merchandise or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof.

"(j). 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any state; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any state.

"Sec. 202. *Congressional finding and declaration of policy.* (a) The Congress hereby finds that the existence, in industries engaged in commerce or in the production of goods for commerce, or labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of commerce to be used to spread and perpetuate such labor conditions among the workers of the several states; (2) burdens commerce and the free

flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.

"(b). It is hereby declared to be the policy of sections 201-219 of this title, through the exercise by Congress of its power to regulate commerce among the several states, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power. June 25, 1938."

Appellees state that they are covered by said Act "because (1) they were engaged in commerce, or (2) because they were engaged in an occupation necessary to the production of goods for commerce," and in addition they quote and rely upon the provisions of § 203 (j) which defines the terms "produced" and the phrase "production of goods" which has already been quoted.

The questions presented for decision, as we see it, are: (1) Were the appellees or any of them "engaged in commerce or in the production of goods for commerce?' (2) Was the material and equipment referred to in the complaint the property of the U. S. A. and, therefore, was never in commerce within the meaning of said Act?

A congressional finding and declaration of policy of the Act are set out in § 202, and the U. S. Supreme Court, in U. S. v. Darby, 312 U. S. 100, 61 S. Ct. 451, 85 L. Ed. 609, 132 A. L. R. 1430, in stating the "evils aimed at by the Act," said:. "As we have said, the evils aimed at by the Act are the spread of substandard labor conditions through the use of the facilities of interstate commerce for competition by the goods so produced with those produced under the prescribed or better labor conditions; and the consequent dislocation of the commerce itself caused by the impairment or destruction of local businesses by competition made effective through interstate commerce. The Act is thus directed at the suppression of a method or kind of competition in interstate

commerce which it has in effect condemned as 'unfair.' as the Clayton Act has condemned other 'unfair methods of competition' made effective through interstate commerce. See *Van Camp & Sons Co.* v. *American Can Co.*, 278 U. S. 245, 49 S. Ct. 112, 73 L. Ed. 311, 60 A. L. R. 1060; *Federal Trade Comm'n* v. *Keppel & Bro.*, 291 U. S. 304, 54 S. Ct. 423, 78 L. Ed. 814.'' If, therefore, these appellees were engaged in commerce or in the production of goods for commerce, they are covered by the Act.

The appellees were all non-manual workers. They were clerks, record keepers, time keepers, and checkers of material that were shipped into the plant and checked material and supplies out on requisitions by various authorized persons to be used in the construction of the plant. One or more of them were promoted to the position of foreman for a time, and one, Upton, was a water man, making deliveries of drinking water and cups to the other appellees and other employees and maintained toilet facilities, etc.

It appears to be undisputed that all material and supplies shipped in for this plant are consigned or billed on the lading to the Area Engineer of the War Department, El Dorado, Ark., for the account of H. B. Deal & Co., Inc. Prior to the construction by the Government of a railroad track from Norphlet to the Plant, some 3 or 4 miles distant, material and equipment for the Plant that arrived by rail and billed as above stated are delivered to the Area Engineer and hauled to the Plant in Government trucks. After the completion by the Government of the short line of railroad all cars of material and equipment were delivered by the carrier, Mo. Pac. Ry. Co., to the Area Engineer at the junction of its switch track with the Government's line, and was moved to the Plant over the Government's line by a Government locomotive. All the work done by the appellees in connection with such shipments was done at the plant, some 3 or 4 miles away from Norphlet. It may be true, possibly is, that one or more of the appellees did some checking of material and made some records thereof when cars were unloaded onto Government trucks prior to the completion of the line from Norphlet to the plant. We think this fact, if it be a

fact, would not furnish a sound reason to say that appellees were engaged in commerce within the meaning of the Act, for the reason that the interstate journey of the shipment had come to rest when the carrier delivered the shipment to the Area Engineer at the point of destination. While El Dorado was the named point of destination of all shipments, by an arrangement with the carrier, the cars were delivered at Norphlet, a small town near El Dorado, at least after the Government's line was built from thence to the plant. We assume, for the purpose of this opinion, that all shipments originated outside of Arkansas. And for the further reason that the material and equipment were delivered to the **agent** of the Government or to the Government itself and by him or it to appellant, the ultimate consumer. They were not to be shipped out in commerce again, and, of course, the buildings, and the machinery and equipment installed in them were not the subjects of commerce. The plant was a very large and costly one. Many buildings were erected, covering several thousand acres of land.

In *Walling* v. *Jacksonville Paper Co.*, 317 U. S. 564, 63 S. Ct. 332, 87 L. Ed. 460, the court said: "The contract or understanding pursuant to which goods are ordered, like a special order, indicates where it is intended that interstate movements should terminate." In this connection Major Campbell, Area Engineer, testified without any dispute that he was the authorized representative of the Government, the contracting officer, Corps of Engineers, in the construction of the plant, and that the United States Government accepted the box cars and took them into its possession and under its control at the spur. The bills of lading indicated where the interstate movement terminated and the testimony of Major Campbell shows that the cars of material and equipment were delivered to the ultimate consumer and that their movement in commerce had ended before any of the appellees did any work in connection with them. So, they were not engaged in commerce within the meaning of said Act.

But appellees insist that, if they were not engaged in commerce, they were engaged in the production of goods for commerce. This argument is based on the fact

that the plant was to be used in the manufacture and shipment of ammonium in commerce when completed, which is, in our judgment, a false assumption, since the Government would use the product of the plant for the manufacture of munitions to be used in the prosecution of the war in which we were then engaged, and, while it would cross state lines, the Government is the sum of all the states and of itself knows no state lines in the manufacture and shipment of war material. Moreover, the Act does not purport to apply to the Government. It applies to employers of labor who are engaged in commerce. It says: "No employer shall . . . employ any of his employees who are engaged in commerce," etc. Clearly, it has no reference to the Government. But the proof shows that another company operated the plant after completion, and it is not contended that any of the appellees were connected in any way with its operation.

In *Brue* v. *J. Rich Steers, Inc.*, 60 Fed. Supp. 668, both points were decided against appellees here. The court said: "It is further contended by plaintiff that he was engaged in the production of goods for interstate commerce as he was handling materials which had been shipped in interstate commerce, including steel forms, stone, sand, tremic cement, and structural steel. This argument must be eliminated for these materials had passed into the actual physical possession of the ultimate consumer. See Fair Labor Standards Act, 29 U.S.C.A., § 203 (i).

"It is also urged in behalf of plaintiff that in helping to construct a dry dock to be used in the building of vessels for interstate commerce, he was engaged in the production of goods for interstate commerce. A completed dry dock, when used for the building and repair of vessels, may be so closely related to interstate commerce that its employees might be regarded as being engaged in interstate commerce. But a distinction must be made between the original construction of a dry dock before it is erected and used and after it is erected. *Barbe* v. *Cummins Construction Co.* (D. C.), 49 Fed. Supp. 168, Affirmed, 4 Cir., 138 Fed. 2d 667.

"One employed as an inspector of concrete work in the original construction of a new building is not himself engaged in interstate commerce or in the production of goods which pass into interstate commerce, nor did his services directly relate to interstate commerce, although the building, when finished, is intended for use for the production of goods for interstate commerce. *Noonan* v. *Fruco Const. Co.*, 8 Cir., 140 Fed. 2d 633; *Scott* v. *Ford, Bacon & Davis* (D. C.), 55 Fed. Supp. 982; *Wells et al.* v. *Ford, Bacon & Davis,* 7 Labor Cases, Par. 61, 929, affirmed 6 Cir., 145 Fed. 2d 240. See, also, *Dollar* v. *Caddo River Lumber Co.* (D. C.), 43 Fed. Supp. 882.

"Such is the interpretation by the Wage and Hour Division of the Department of Labor, in Bulletin No. 5, paragraph 12, which says that—'The question arises whether the employees of builders and contractors are entitled to the benefits of the Act. The employees of local construction contractors generally are not engaged in interstate commerce and do not produce any goods which are shipped or sold across state lines. Thus, it is our opinion that employees engaged in the original construction of buildings are not generally within the scope of the Act, even if the buildings when completed will be used to produce goods for commerce. There may be particular employees of such construction contractors, however, who engage in the interstate transportation of materials or other forms of interstate commerce and are for that reason entitled to the benefits of the Act.''

See, also, the Noonan and other cases cited in the above quotation. What was said in the Noonan case applies with equal force here. To interpolate just a little, "It is difficult to perceive how the close ties and connections of the watchmen (checkers and clerks) to the productive processes involved in the construction of the plant can be stretched to also cover the productive processes involved in the making of munitions. The operations of the watchmen (checkers and clerks) were not a vital function of, nor an integral part in, the productive processes connected with the manufacture of munitions, nor did the work have any of the essential characteristics of munition manufacture.''

In *Dollar* v. *Caddo River Lumber Co.*, 43 Fed. Supp. 822, Judge MILLER of the Western District of Arkansas, held, to quote a headnote: "An employee engaged in construction of sawmill to replace sawmill destroyed by fire was not engaged in 'commerce' or 'production of goods for commerce' within the Fair Labor Standards Act, notwithstanding that new sawmill, after its construction, was used in commerce and in production of goods for commerce. Fair Labor Standards Act, 1938, 29 U.S.C.A. 201 *et seq.*"

To support their contention that appellees were engaged in commerce "because their activities were in connection with the unloading of materials moving in interstate commerce," appellees cite and quote from a number of cases, *Walling* v. *Goldblatt Bros., Inc.*, 128 Fed. 2d 778; *Walling* v. *Mutual Wholesale Food & Supply Co.*, 46 Fed. Supp. 939; *Clyde* v. *Broderick*. 144 Fed. 2d 348; and a number of others, but especially do they rely on *Clyde* v. *Broderick,* of which thay say the "facts were identical to those in the case at bar." We cannot agree with appellees that the facts in that case are identical or even similar to those here. In that case the "trial court sustained a motion to dismiss the action on the grounds that it appeared from the complaint that the employees were not 'engaged in commerce or in the production of goods for commerce' within the purview of the Fair Labor Standards Act." On appeal the Circuit Court of Appeals for the Tenth Circuit held that the complaint did state a cause of action and summarized it as follows: "Fairly summarized, the complaint states that Broderick and Gordon were engaged in the construction of an ammunition plant at Salt Lake City, Utah, pursuant to a contract with the United States Government, and the Remington Arms Company. That during the construction period, equipment, tools and other supplies either owned by Broderick and Gordon or rented or purchased by them, for use on the project were transported on their order from points outside into the state of Utah, and after use there boxed, crated and shipped to points outside the state. That the appellants were employed as warehouse or tool inventory clerks 'to handle the tools and equip-

ment which were shipped to the Utah Ordnance Plant from points outside the state of Utah,' and to prepare the tools and equipment thus shipped, and when said tools and equipment were no longer needed on the project they boxed, crated and otherwise prepared them for shipment to various points outside the state of Utah. Appellants claimed overtime hours in excess of the statutory workweek and prayed statutory compensation therefor . . .''

The distinction between that case and this is the allegation in that case that the plaintiffs were engaged in unloading of tools and equipment which had been shipped in interstate commerce and the preparation of tools and equipment for shipment in interstate commerce, whereas here the material and equipment which had moved in interstate commerce had been delivered to the ultimate consumer and its interstate movement had ended before appllees had anything to do with it, and such material and equipment went into the construction of the plant, without either allegation or proof that any part of it was to be prepared for shipment or be reshipped in interstate commerce.

We think all the cases cited and relied on by learned counsel for appellees are distinguishable from the case at bar and have been by counsel for appellant in the reply brief. To take them up and discuss each of them would unduly extend this opinion.

We, therefore, hold that appellees were not engaged in commerce or in the production of goods for commerce within the purview of the Fair Labor Standards Act, and that said Act has no application to the Government of the United States of America in its activities in the prosecution of a war.

The learned trial court erred in holding otherwise and its judgment is accordingly reversed and the cause dismissed.

Robins, J., dissenting. I respectfully dissent from the majority holding as to all of the appellees except John Allen Upton, whose work apparently did not in any

manner pertain to the production or movement of goods in interstate commerce.

The duties of appellees, George G. Leonard, Charles E. May, Albert C. Merritt, Aubrey O. Fielder and Clarence T. Key, were to check inbound shipments of material, consigned to their employer. They did this work by inspecting the freight as it was unloaded from the railroad cars or from the trucks. As one of the appellees put it: "I performed these duties as the materials were being unloaded from the railroad cars and trucks." More than half of these shipments originated outside the state of Arkansas. The checking was not done *after* delivery of the freight to their employer, but *while* such delivery was being effected. Therefore, when their work was performed the movement of the goods from point of origin outside of Arkansas to consignee was still incomplete.

Even if those employees of appellant who were actually engaged in construction should be held not to be engaged in work of an interstate nature, it does not follow that all of appellees were excluded from the benefits of the Fair Labor Standards Act. The interpretative bulletin of the Wage and Hour Division of the Department of Labor (Bulletin No. 5, paragraph 12), which is quoted in the majority opinion, while it states that the employees engaged in the original construction of buildings are not *generally* within the scope of the Act, concludes thus: "There may be particular employees of such construction contractors, however, who engage in the interstate transportation of materials or other forms of interstate commerce and are for that reason entitled to the benefits of the Act." "The fact that all of respondent's business is not shown to have an interstate character is not important. The applicability of the Act is dependent on the character of the employees' work. *A. B. Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 62 S. Ct. 1116, 86 L. Ed. 1638. If a substantial part of an employee's activities related to goods whose movement in the channels of interstate commerce was established by the test we have described he is covered by the Act." *Walling* v. *Jacksonville Paper Company,* 317 U. S. 564, 63 S. Ct. 332, 87 L. Ed. 460.

It seems to me that these checkers were engaged in work that was essentially a part of interstate commerce as defined in various decisions of the Supreme Court of the United States. The same kind of work as that involved here was held to be subject to the Fair Labor Standards Act in the case of *Walling* v. *Goldblatt Bros., Inc.,* 128 Fed. 2d 778, certiorari denied 318 U. S. 757, 63 S. Ct. 528, 87 L. Ed. 1130. I think the reasoning of the opinion in that case and the authorities cited therein control here.

The contention that the Fair Labor Standards Act does not apply in the case at bar because the appellant was performing a contract for the United States Government is, in my opinion, completely answered by the opinion of the supreme court of Iowa in the case of *Umthun* v. *Day & Zimmerman, Inc.,* 235 Ia. 293, 16 N. W. 2d 258.

I am authorized to state that Mr. Justice MILLWEE concurs in the views expressed above.