585 F.Supp. 522 (1984)
COLORADO DEPARTMENT OF SOCIAL SERVICES, Plaintiff,
v.
The DEPARTMENT OF HEALTH AND HUMAN SERVICES, Margaret M. Heckler, in her official capacity as Secretary of Health and Human Services, Donald Garrett, Norval Settle and Cecilia Sparks Ford, in their official capacities as members of the Departmental Board of Grant Appeals and The Departmental Board of Grant Appeals, Defendants.
Civ. A. No. 83-K-1365.
United States District Court, D. Colorado.
May 8, 1984.
*523 Wade Livingston, Asst. Atty. Gen., Human Resources Sec., Denver, Colo., for plaintiff.
Robert N. Miller, U.S. Atty. and James W. Winchester, Asst. U.S. Atty., Denver, Colo., for defendants.

ORDER
KANE, District Judge.
This is an appeal by the state from an adverse decision of the Departmental Grant Appeals Board (DGAB), an arm of the Department of Health and Human Services to whom Mrs. Heckler has delegated the power and authority to adjudicate disputes concerning federal funding of the states' medicaid system. Finding the board's decisions neither arbitrary, capricious nor contrary to law, I affirm.

BACKGROUND
Before the board, the Secretary sought to disallow payments Colorado had made to nine medicaid vendors in Colorado. Before me, however, the state only challenges two of those disallowances: To Eventide of Durango, for a period from April 1, 1978 to June 4, 1980 and to Sharmar Nursing Center from November 1, 1973 to August 2, 1974.
The Colorado Department of Health licensed Eventide to provide nursing care services and certified it as complying with all applicable state and federal standards. The certificate of compliance is an absolute condition precedent to the state's reimbursement for payments to medicaid vendors. In the cant of the trade, the federal disbursements are termed federal financial participation (FFP). Federal regulations require the state to survey the medicaid facilities at least once a year to determine if Eventide could still be certified as in compliance with federal medicaid requirements. 42 C.F.R. § 442.12 (1983). When properly licensed and certified, Eventide entered into a contract, called a provider agreement, with Colorado to provide nursing care services to medicaid eligible patients. A provider agreement is subject to annual review by the Colorado Department of Health and cannot be effective for more than one year. 42 C.F.R. § 442.15 (1983).
In an unannounced survey in February, 1977, the Health Department found Eventide not operating according to state and federal requirements. It therefore moved to terminate its license and certification. The state, in turn, moved to terminate the provider agreement. After appropriate hearings under the Colorado Administrative Procedure Act, final agency action terminated the provider agreement on June 22, 1978 and the license and certification on September 1, 1978. The Denver District Court, where Eventide sought judicial review, reversed the administrative actions taken against it. The Colorado Court of Appeals reversed in part and affirmed in part. Since then, the Colorado Supreme Court has granted certiorari and the case is pending before it.
Similar action by the Department of Health led to the termination of Sharmar's license and certification effective December 27, 1972. After an adverse administrative decision in March, 1974, Sharmar sought *524 judicial review and got a stay pending review. Sharmar went out of business soon after the stay issued, thus the reviewing court never reached the merits of the delicensure and decertification.
While the state was fighting its administrative battles with Sharmar and Eventide, it received notice from HHS that FFP funds for Sharmar and Eventide had been disallowed for those periods of time after the provider agreements should have terminated or expired, notwithstanding the stays issued by the state courts. Colorado filed a timely appeal before the DGAB. The board informally consolidated the Colorado appeals with those of several other states, all of which disputed HHS's interpretation of a guideline termed PRG-11. In pertinent part, that guideline provides:
[W]hen a facility appeals the termination of its provider agreement, federal financial participation is not available for payments to the facility during the appeal, since the provider does not have a currently effective provider agreement. The fact that the facility formerly had a provider agreement gives no basis for federal financial participation in payments to the facility for the period while the appeal is before the administrative agencies or the courts. If, however, state law provides for continuing validity of the provider agreement pending appeal, or if the facility is upheld on appeal and state law provides for retroactive reinstatement of the agreement, the agreement would not be considered terminated during the appeal period for purposes of federal financial participation for payments to the facility.
Throughout the appeal before the board, HHS argued that PRG-11 had either been modified or repealed by later regulations which limit the availability of FFP to a few narrow circumstances made explicit in the regulation. See Record, Tab 15 at 22-28. Colorado, of course, thought PRG-11 directly on point, thus making the FFP disallowances improper.
The board affirmed in part and reversed in part HHS's disallowances. It upheld the validity of PRG-11, but applied a 12 month limitation on FFP during the appellate process which it had first announced in a companion case, Ohio Department of Public Welfare, Decision No. 173 (April 30, 1981). The board reasoned that since the state cannot grant certification for more than 12 months, it would be improper to permit a substandard facility to receive funds for more than 12 months.
The Board in Ohio did not find that FEP is available during an appeals process of indefinite duration. Rather, the Board considered the regulatory requirements of an annual survey and certification as establishing the limits as to when FFP is available during a provider appeal under a provider agreement whose continued validity is established by State law. The Board [in Ohio] stated:
`We find that the purpose of reexecuting provider agreements on a frequency of 12 months or less is not to give new life to a perennial record-keeping requirement, but to reinforce the pattern of surveying facilities at least once a year. The survey requirement predates and necessarily limits PRG-11.'
Record, Tab 25 at 7, 8. The board remanded the case for reconsideration of the disallowances in light of the new interpretation of PRG-11. HHS followed the board's directive and disallowed approximately $767,574 at issue here. Colorado unsuccessfully appealed that decision to the board on June 14, 1982. After again receiving an adverse decision, it brought this action for judicial review.
Only one other district court in the country has considered the propriety of the board's 12 month limitation on FFP pendente lite, Michigan Department of Social Services v. Schweiker, 563 F.Supp. 797 (D.Mich.1983). There, the state argued, inter alia, that the Secretary lacked
the authority to disallow the FFP at issue here absent a duly promulgated regulation .... The state contends that the policy giving rise to the disallowance taken by the defendant should have been *525 implemented pursuant to [the formal rulemaking provisions of] § 4 of the Administrative Procedure Act.
563 F.Supp. at 799. The Michigan court concluded that the case involved either an instance of quasi-adjudication or an instance of interpretive rulemaking. In either event, formal rulemaking was thought unnecessary. 563 F.Supp. at 799, 800.
I raise the issue here because Colorado again suggests the board acted in excess of its authority.
The central issue in this case, an issue that defendants' answer brief never squarely confronts, is whether there is any statutory or regulatory authority for the twelve month limitation on FFP during an appeal.
If no such authority can be found, the board's decision must be reversed. The board has no rule-making authority, and its decisions cannot be affirmed simply because they have a rational policy basis. They must have some statutory or regulatory basis.
Reply Brief at 2. This argument misses the mark. The board in this and the Ohio case did not purport to be doing anything but applying a rule which had always been implied in PRG-11, if never explicitly expressed. The board's view on its actions are, of course, not binding on me. Accepting for the moment that the effect of an interpretive rule is to explain a statute while the effect of a legislative rule is to implement the statute, Chamber of Commerce of United States v. O.S.H.A., 636 F.2d 464, 469 (D.C.Cir.1980), what the board has done in this case is to create a new rule in the process of adjudicating the claims before it.
Reduced to their very essence, Colorado's claims amount to objections to the resultant unfairness stemming from the announcement of a new rule in an adjudicatory setting. I share the state's sense of outrage. I agree that it "puts Colorado in the unenviable position of racing against the clock every time it takes an action against the license of any medicaid vendor." Brief at 17. I disagree, however, that this is the very essence of being arbitrary and capricious. The decision to proceed by adjudication or by rulemaking "lies primarily in the informed discretion of the administrative agency." NLRG v. Bell Aerospace Co., 416 U.S. 267, 293, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974), quoting SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947).
Novel and provocative case law from the Ninth Circuit demands that an "agency ... proceed by rulemaking [not by adjudication] if it seeks to change the law and establish rules of widespread application." Ford Motor Co. v. FTC, 673 F.2d 1008, 1009 (9th Cir.1981). Professor Davis, while not embracing the Ninth Circuit position whole-heartedly, tentatively concludes:
the degree of undesirability of changing law through adjudication varies with circumstances, and a sharp degree of such undesirability may combine with other elements of unfairness to induce courts to consider whether they should in particular cases require an agency to use rulemaking procedure. Such elements include abrupt change in established law, as distinguished from gradual or evolutionary change and as distinguished from making law where none existed before; the degree of unfairness of retroactive application of the changed law in the particular circumstances; the justifiable reliance by the objecting party on the previous law; the possible unfairness to nonparties who are denied opportunity to influence the law-making that drastically affects them; and the unexpectedness of the change.
K. Davis, Administrative Law Treatise, 1982 Supplement, § 7.25 at 186. I am not convinced that the record in this case is sufficiently developed for me to consider properly the five factors Professor Davis suggests. More to the point, perhaps, is the fact that the Tenth Circuit shows little inclination to sidestep Chenery, supra, in favor of a Ninth Circuit approach. See Nevada Power Co. v. Watt, 711 F.2d 913, 927 (10th Cir.1983). I accordingly must reject the state's assertion that the board *526 acted without proper authority. I will review this case solely on the arbitrary, capricious standard dictated by 5 U.S.C. § 706(2)(A).
Colorado makes three basic arguments in this appeal. I will treat them seriatim. It first argues that the board's interpretation is erroneous because it conflicts with a decision from the Second Circuit, Maxwell v. Wyman, 478 F.2d 1326 (2d Cir.1973). I agree the cases are similar. The Maxwell court refused to permit HHS's predecessor to terminate FFP funds pending judicial review of administrative action by which New York sought to terminate the certification of a large number of nursing homes.
The precise issue before the Second Circuit was the meaning to be given to the stipulation HEW and the state had entered in light of the court's earlier decision that HEW could not terminate FFP without a pre-termination administrative hearing. Maxwell v. Wyman, 458 F.2d 1146 (2d Cir. 1972). Relying on PRG-11, HEW claimed it could terminate FFP after an adverse administrative hearing. The state thought there had to be a final decision, including judicial review. The Second Circuit ordered FFP to continue pending judicial review.
It is perfectly obvious that where any enforcement of any administrative order has been stayed pending judicial review, the provider agreement has not been terminated, decertification has not occurred, and the agency decision has not been finally made.
478 F.2d at 1329.
Maxwell is an awkward case for the government. It is not, however, binding authority in this circuit, particularly since it was announced well before the board's decision in this and the Ohio case. Not argued before the Second Circuit was the issue before me: whether it is arbitrary and capricious to place a 12 month cap on FFP dollars to medicaid providers during the pendency of an appeal. Maxwell is thus distinguishable.
Colorado next argues that the board's interpretation of PRG-11 is in error because it conflicts with ten years of experience in interpreting the rule. The state points to a 1977 "letter ruling" or interpretive rule issued by Dr. M. Keith Weikel, Acting Director of the Medicaid Bureau of HEW; to Notices of Proposed Rule Making in 1977 and 1979; and to the Secretary's own legal arguments before the board in this case.
The 1977 letter explains how FFP is available for 30 days after a provider agreement terminates so that patients can be relocated to a new nursing home. See 42 C.F.R. §§ 441.11 and 442.15(c) (1983). The letter says:
The thirty day period begins only subsequent to the final determination of a provider agreement, after all appeals have been exhausted.
In the Notices of Proposed Rule Making of January 19, 1977 and February 15, 1979, HHS suggested that it would be issuing new rules
to clarify the point at which Federal funding of Medicaid payments would cease for a facility that has been terminated from the Medicaid program.... [and to consider] what effect State laws and court injunctions against States which continued State payments to facilitate or extended their provider agreements throughout the hearing process should have on Federal Medicaid payments.
44 F.R. 9749 (February 15, 1979). No new rules were ever issued.
Finally, Colorado points outin an unusual variation on expressio unius exclusio alterthat counsel for HHS "did not urge or rely upon any twelve month limitation in PRG-11 [in its arguments before the board].... It is reasonable to assume
That if PRG-11 had always included a twelve month limitation, counsel for HHS would have known about it and relied upon it in the proceedings before the board.
Brief at 16.
I disagree with Colorado about the significance of this supposition; it is entirely *527 speculative. Even accepting it, however, does not make the board's action arbitrary or capricious. Instead it suggests that in 1977 and 1979 HHS had not fully resolved how it would treat FFP during appeals. HHS resolved the ambiguity of its position in the series of adjudications commencing with the Ohio case and continuing on with this case.
Colorado's final argument to overturn the board's decision claims that
(1) It hobbles Colorado in its attempt to vigorously enforce [sic] federal medicaid standards, and
(2) It denies FFP in payments to Eventide although Colorado has determined Eventide substantially complied with federal standards during nearly all the period of disallowance.
Brief at 17. This argument needs a little more background.
While Eventide sought judicial review of the adverse administrative action against it, Colorado learned that there would be no FFP in payments to Eventide beginning March 1, 1977. To prevent a further loss of federal funds, Colorado and Eventide stipulated to the home's certification, license and provider agreement during judicial review. The state entered into the stipulation only after resurveying Eventide's facility as of June 22, 1978, finding it in substantial compliance with state and federal regulations. The state chose not to transmit the results of the new survey to HHS until 1980. Counsel candidly admits this was done out of fear of "prejudice or mootness in the action against Eventide's license and certification," and in reliance on PRG-11.
HHS, after the board's original remand, took the position that
the certification could not be effective during the periods of these disallowances any earlier than the date on which it was executed, as provided by the regulations in effect at that time.
Record, Tab 9, Attachment A at 2. The Secretary now objects to my consideration of the issues, claiming that Colorado should have presented the issue to the board first.
I agree. In its original remand order the board considered the effect of the surveys and stipulations during the appeals process. The board did not feel, however, that the issue had been adequately briefed "by the parties for [it] to reach an informed decision." Record, Tab 25 at 13. The board directed
HCFA to examine the documents submitted by the State in its April 6, 1981 letter, indicating that the facility was surveyed throughout the appeals process and that certification decisions were made, to determine if the facility, having won its appeal, qualifies for FFP for any period beyond March 31, 1978. HCFA should modify, reverse, or reaffirm the disallowance accordingly. If the State disagrees with any determination made by HCFA pursuant to these instructions, the State should appeal that determination to the board within thirty days after receipt of that determination.
Record, Tab 25 at 13. For reasons not entirely clear from the record before me, Colorado never again pursued this issue. See Tabs 6, 9, Exhibit A. The state's failure to address the issue is fatal to its attempt to have me decide it here now. It should have first been presented to the board. St. Regis Paper Co. v. Marshall, 591 F.2d 612 (10th Cir.1979).

CONCLUSION
Finding the board's decision neither arbitrary, capricious nor contrary to law, I will uphold it and order judgment entered for defendants.