**STOTLER AND COMPANY and Richard C. Allen, Petitioners,**

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

**No. 86–2695.**

United States Court of Appeals, Seventh Circuit.

Argued April 9, 1987.

Decided Aug. 25, 1988.

---

Thomas F. Kolter, Chicago, Ill., for petitioners.

Daniel S. Goodman, Commodity Futures Trading Com'n, Washington, D.C., for respondent.

Before CUMMINGS, WOOD, Jr. and MANION, Circuit Judges.

MANION, Circuit Judge.

Stotler and Company ("Stotler") petitions this court to review an order of the Commodity Futures Trading Commission ("the Commission") finding Stotler, a futures trading house, vicariously liable under the Commodity Exchange Act's (the Act's) [1] antifraud provisions for the actions of Richard Allen, a commodity trading advisor and pool operator, in soliciting accounts he traded through Stotler. The Commission also found that Stotler violated one of the Act's registration provisions by not registering Allen as an "associated person." Having taken a fresh look at the evidence, we affirm the Commission's order for the reasons stated in its opinion. *In re Stotler and Company*, CFTC Docket No. 80–7, Comm.Fut.L.Rep. (CCH) ¶ 23,298 (CFTC Sept. 30, 1986).

---

1. The Act is codified as 7 U.S.C. §§ 1 ff. (1976).

## I. NATURE OF THE CASE

Briefly stated, Stotler, a partnership, is a registered futures commission merchant. Allen was a commodity trading advisor who prepared a weekly tout sheet with his advice. He was also a commodity pool operator who traded discretionary accounts for his clients.

Sometime in 1975, Stotler's managing partner, Howard Stotler, agreed on behalf of Stotler to rebate to Allen half of the gross commissions generated on all accounts Allen brought to Stotler. Allen subsequently registered as a commodity trading advisor and commodity pool operator, but did not register as an associated person of Stotler's.[2] At the time of this agreement—and up to the present—a futures commission merchant could lawfully share commissions with trading advisors as well as with associated persons.

The relationship between Stotler and Allen encompassed more than sharing the commissions generated by the trades that Allen placed with Stotler. Stotler's internal business records listed Allen as a salesman and Stotler assigned Allen a salesman number. Stotler gave to Allen its own literature and forms to distribute to those people Allen solicited. In addition, Stotler permitted Allen to place his trades directly through its clerks on the floors of the commodities exchanges.

At the hearing before the administrative law judge, one of Allen's and Stotler's joint clients, Arthur Lipton, testified that he received from Allen the trading authorization and customer agreement forms necessary to open an account with Stotler. Allen had told Lipton that Stotler was the only brokerage house through which Lipton could trade. Subsequently, when Lipton had a question about his monthly statement from Stotler, Edwin Hansen, who testified that he was "in charge of" Stotler's futures trading department, told Lipton to direct his inquiry to "the broker on the account," whom Hansen identified as Allen.

Patrick Thompson, a Commission investigator, testified that Allen dealt exclusively with Stotler. Allen had told this investigator that he had

> proposed to Mr. Stotler that he wanted to put his business through one merchant and that he was trying to arrive at what would be an acceptable rate for putting his business through one merchant, and they negotiated whatever the rate was ... and ... he then began to put through all of his business through Stotler & Company.

It is undisputed that Allen not only failed to disclose the commission-sharing arrangement with Stotler to his clients and potential clients, but that he also affirmatively misrepresented how he was compensated. In particular, Allen told clients that he was paid only a percentage of the client's profits and that he received no part of any commissions. For example, Allen wrote to client Lipton as follows:

> My single purpose is to make money for *you*. I receive *no* part of the commissions or any type of reward for the trading I do on your behalf. This simply means that if I make you money I will make money.

For purposes of this appeal, Stotler does not dispute the Commission's finding that Allen willfully engaged in statutory commodities fraud in soliciting the commodities accounts that were traded through Stotler.

## II. NATURE OF THE PROCEEDINGS

In October, 1979, the Commission filed an administrative enforcement complaint against Stotler and Allen for violations occurring in the period between April 1, 1977 through July 1, 1978. The Commission brought the first count (Count I) pursuant to § 4b of the Act, 7 U.S.C. § 6b (1976), and the second (Count II) pursuant to § 4o, 7 U.S.C. § 6o (1976). Both counts arose from the same underlying factual allegations that Allen failed to disclose and instead affirmatively misrepresented the

---

**2.** An "associated person" is "any person ... associated with any futures commission merchant ... as a partner, officer, or employee (or any person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation or acceptance of customers' orders (other than in a clerical capacity)." § 4k of the Act, 7 U.S.C. § 6k (1976).

commission-sharing arrangement. Both counts charged Stotler not only as aiding and abetting Allen but also as Allen's principal under § 2(a)(1)(A), 7 U.S.C. § 4 (1976), which makes a principal liable for the acts of his agent which violate the Act. (An aider and abettor need not be a principal, nor need a principal aid and abet.)

Section 4b, the Act's general antifraud provision, makes it unlawful "(2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery made ... for or on behalf of any other person ... (A) to cheat or defraud or attempt to cheat or defraud such other person...." 7 U.S.C. § 6b (1976). Section 4o is a parallel statute forbidding fraud and misrepresentation by commodity trading advisors. Section 4o (1) makes it unlawful "for any commodity trading advisor or commodity pool operator ... (A) to employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant." 7 U.S.C. § 6o (1976).

Also at issue on appeal is a third count (Count III) which alleged that Stotler violated § 4k, 7 U.S.C. § 6k (1976), by allowing Allen to remain associated with it when Allen had not registered with the Commission as an associated person and Stotler knew or should have known that Allen was not so registered.

The ALJ found against Stotler and Allen on all three counts. He imposed a $10,000 fine upon Stotler and ordered Stotler to stop violating these provisions. Stotler filed a timely notice of appeal to the Commission from the ALJ's initial decision. Allen did not appeal. On September 30, 1986, the Commission issued its opinion and order, which affirmed the initial decision with minor modifications not relevant here.

### III. ANALYSIS

#### A. Standard of Review

This court's standard of review on direct appeal from the Commissioner is set forth in § 6(b) of the Act, which provides in pertinent part as follows:

> After the issuance of the order by the Commission, the person against whom it is issued may obtain a review of such order ... by filing in the United States court of appeals ... a written petition.... Upon the filing of the petition the court shall have jurisdiction to affirm, to set aside, or modify the order of the Commission and the findings of the Commission as to the facts, if supported by the weight of evidence, shall in like manner be conclusive.

7 U.S.C. § 9 (1982). "[T]he function of this court is ... to review the record with the purpose of determining whether the finder of the fact was justified, i.e., acted reasonably, in concluding that the evidence, including the demeanor of the witnesses, the reasonable inferences drawn therefrom and other pertinent circumstances, supported his findings." *Silverman v. CFTC*, 549 F.2d 28, 30–31 (7th Cir.1977) (quoting *Great Western Food Distributors v. Brannan*, 201 F.2d 476, 479–80 (7th Cir.1953)).

#### B. Stotler's Liability for Allen's 4b and 4o Violations

With regard to its liability for Allen's fraud, Stotler protests that the industry accepts a futures commission merchant and a trading advisor sharing brokerage commissions, and that the futures commission merchant is not required by law or by custom to disclose the arrangement to the shared customers. We assume for purposes of this appeal that Stotler's position is correct.

■ The Commission did not penalize Stotler for what it did, but rather for what its agent Allen did. Section 2(a)(1)(A) of the Act, 7 U.S.C. § 4 (1976) provides in pertinent part as follows:

> For the purpose of this chapter the act, omission, or failure of any official, agent, or other person acting for any ... partnership ... within the scope of his employment or office shall be deemed the act, omission, or failure of such ... part-

nership ... as well as of such official, agent, or other person.

Section 2(a)(1)(A) has not changed since its enactment in 1922. Pub.Law No. 67–66, 42 Stat. 187 (1921). Section 2(a)(1)(A) imposes vicarious liability upon a principal for the acts of its agent committed within the scope of his employment. *Cange v. Stotler and Co.*, 826 F.2d 581, 589 (7th Cir.1987); *Rosenthal & Co. v. CFTC*, 802 F.2d 963, 966 (7th Cir.1986); *Bogard v. Abraham–Rietz & Co.*, Docket No. R 77–315, [1984–1986] Comm.Fut.L.Rep. ¶ 22,273 at 29,393 n. 13 (CFTC 1984). As under the common law, under § 2(a)(1)(A) it does not matter if the principal participated in or even knew about the agent's acts; he is strictly liable for them. *Cange, supra*, 826 F.2d at 589; *Rosenthal, supra*, 802 F.2d at 966–67.

Stotler first contends that the Commission's complaint did not adequately plead § 2(a)(1)(A) liability. We reject this contention. First, in Count I the complaint tracked the language of § 2(a)(1)(A) and alleged that Stotler and Allen violated § 4b "either directly or by an official, agent, or other person acting for such respondent within the scope of the employment or office of such official, agent, or other person." In paragraph 4 of that first count, the complaint expressly alleged that Allen was acting as Stotler's agent. The complaint then realleged and incorporated Paragraph 4 into Count II regarding the § 4o violation. Second, Stotler fails to explain anywhere how it would have conducted its defense differently if the complaint had been drafted as clearly as Stotler would now like. Thus, the complaint adequately notified Stotler that the Commission was relying in part upon § 2(a)(1)(A)'s vicarious liability.

The real question is whether Allen was acting as Stotler's agent for soliciting customers to trade commodity futures accounts. If so, then under § 2(a)(1)(A), Stotler is liable for the frauds Allen committed furthering his agency. Stotler predictably argues that Allen was not its agent.

"Whether one person is an agent acting for another turns ... on an overall assessment of the totality of the circumstances in each case." *Berisko v. Eastern Capital Corp.*, [1984–1986] Comm.Fut.L.Rep. (CCH) ¶ 22,772 at 31,223 (CFTC 1985); *accord Bogard, supra*, [1984–1986] Comm. Fut.L.Rep. (CCH) ¶ 22,273 (CFTC 1984). In reviewing a Commission finding of agency under § 2(a)(1)(A), "[s]ome deference must be paid to the special knowledge which the Commission brings to the regulation of the commodities markets" because "[t]he ascription of agency is a purposive, policy-oriented act rather than an exercise in semantics." *Rosenthal, supra*, 802 F.2d at 969.

The weight of the evidence—and in particular the facts that Stotler and Allen split commissions and that Stotler used Allen to distribute its forms and literature—supports the Commission's finding that Allen was acting as Stotler's agent in soliciting customers for futures trading. See *Berisko, supra*, [1984–1986] Comm.Fut.L.Rep. ¶ 22,772; *Bogard, supra*, [1984–1986] Comm.Fut.L.Rep. ¶ 22,273; see also *Rosenthal, supra*, 802 F.2d at 965. The Commission was correctly influenced by the fact that Allen received a hefty 50 percent rebate on all commissions generated on the accounts that he traded through Stotler. Because "[t]his share came from the trading commissions Stotler would have retained had [Allen not been] involved," the Commission reasoned that "regardless of any agreement of exclusivity, a motivation for the fee-sharing agreement was that Allen would bring additional fee-generating business to Stotler." When a futures commission merchant assists a purportedly independent operator hoping that the operator will solicit more business for the merchant, it is hard not to find that the operator is the merchant's agent when he solicits. *Cf. Rosenthal, supra*, 802 F.2d at 968.

Other factors also point to an agency relationship. In addition to the Commission's finding that Allen agreed to trade exclusively through Stotler—a finding which we discuss in more detail below—Stotler assigned Allen a salesman number, designated him as a salesman in its internal records, and permitted him to telephone

orders directly to the trading floor, as only its employees could do.

As Allen was one of Stotler's agents, "section 2(a)(1) imposes strict liability on the principal ... provided, of course, as the statute also states expressly, that the agent's misconduct was within the scope or (equivalently but more precisely) in furtherance of the agency." *Rosenthal, supra*, 802 F.2d at 966. Stotler does not vigorously contest that if Allen was its agent for the purpose of soliciting customer accounts to generate business, then his fraud occurred in furtherance of that agency. After all, Allen's clients became Stotler's own. Thus, Stotler is liable under § 2(a)(1)(A) for Allen's 4b and 4o violations.

## C. Stotler's Section 4k Violation

Stotler's challenge to its liability for Count III—that Allen was not required to register as an "associated person"—requires wading into the Act's registration scheme. "Registration is the kingpin in this statutory machinery, giving the Commission the information about participants in commodity trading which it so vitally requires to carry out its other statutory functions of monitoring and enforcing the Act." *Flaxman v. CFTC*, 697 F.2d 782, 787 (7th Cir.1983) (quoting *CFTC v. British American*, 560 F.2d 135, 139–40 (2d Cir. 1977), *cert. denied*, 438 U.S. 905, 98 S.Ct. 3123, 57 L.Ed.2d 1147 (1978)).

In 1974, Congress created several new registrant categories, including that of "associated person." *See generally Silverman v. CFTC*, 562 F.2d 432, 435 (7th Cir. 1977). This new section provided in relevant part as follows:

> It shall be unlawful for any person to be associated with any futures commission merchant ... as a partner, officer, or employee (or any person occupying a similar status or performing similar functions), in any capacity which involves (i) the solicitation or acceptance of customers' orders (other than in a clerical capac-

ity) ... unless such person shall have registered ... with the Commission ... and it shall be unlawful for any futures commission merchant ... to permit such a person to become or remain associated with him in any such capacity if such futures commission merchant ... knew or should have known that such person was not so registered....

§ 4k of the Act, 7 U.S.C. § 6k (1976). This statutory definition means that "[a]ny person who solicits orders for the purchase or sale of commodity futures contracts must be registered as an Associated Person with the Commission." *Flaxman, supra*, 697 F.2d at 784 n. 2. Thus, during the period covered by the Commission's complaint, Allen was required to register if he fit within the statutory definition.

■ The ALJ found, and the Commission affirmed, that Stotler and Allen had at least implicitly entered into an exclusive trading agreement under which Allen would place all of his clients' trades through Stotler. Stotler argues that because that determination was not supported by the weight of the evidence, the Commission's determination that Allen was required to register as an associated person is correspondingly erroneous. We reject this contention on two grounds. First, we agree with the Commission that there is "no requirement of 'exclusivity' to establish an associated person under § 4k." If a person acts as a salesman and solicits orders for a particular futures commission merchant, he may be an associated person with that merchant, even if he places some trades with others.[3] Second, the weight of the evidence does support a finding that Stotler and Allen maintained an exclusive trading arrangement.

■ The same evidence that supports the Commission's finding that Allen was Stotler's agent supports a finding that Allen functioned like a Stotler salesman in soliciting accounts to be traded through

---

**3.** The Commission has since prohibited a person from being associated with more than one futures commission merchant. 17 C.F.R. § 3.12(f) (1983). At the time, however, an "associated person" could be associated with more than one futures commission merchant. So even if Allen also placed his clients' trades through another futures commission merchant, that would not mean that Allen was not an "associated person" of Stotler's.

Stotler. Stotler gave Allen its forms and literature to distribute, assigned him a number, permitted him direct access to the trading floors, and shared commissions with him at a rate higher than that given other salesmen (perhaps to compensate him for his unreimbursed expenses).

In addition, the weight of the evidence supports the Commission's finding that there was an exclusive trading agreement between Allen and Stotler. Thompson, the Commission investigator, testified in response to a question from Stotler's counsel that Allen told him that "at the time he was dealing exclusively with Stotler." While this testimony is hearsay, Stotler did not object at the hearing. In addition, because this admission was against Allen's own interest, it would be admissible under the Commission's rules anyway. See 17 C.F.R. § 10.67(a) (1986); *In re Lincolnwood Commodities, Inc.* [1982-1984] Comm.Fut.L.Rep. (CCH) ¶ 21,986 (CFTC 1984). Further, Howard Stotler testified that Allen said that "he [Allen] was a trading advisor and that many of his accounts were with different commission firms, that he would like to place them with Stotler & Company, which I agreed to do."

The size of the commission rebate also indicates that Allen, just as would a Stotler employee, had agreed to place customer trades exclusively with Stotler. In this regard, the ALJ concluded that "there was at least a tacit understanding between Stotler and Allen that the former would be the exclusive broker of Allen." There would be no reason for Stotler to give Allen this "favorable commission split unless Allen would provide the greater volume of business resulting from the exclusive use of one broker." As the ALJ reasoned, "[h]aving obtained a generous split on commissions, it seems unlikely that any other broker would have been used [by Allen], and there is no showing that any other was thereafter involved."

The Commission engaged in similar reasoning:

Specifically, the fact of the large commission split afforded Allen, a person Stotler admits was a relatively small-time commodity advisor, and the fact that Stotler referred to Allen as a salesman both on its business records and verbally to customers, support the finding. Stotler acknowledged that its other salesmen all had exclusive trading arrangements with Stotler.

Whatever the precise nature of the relationship between Stotler and Allen—exclusive or just associated—Stotler knew or should have known that Allen was not registered. Stotler's management interacted with Allen just as with its other employees. Under these circumstances, Stotler should have inquired as to Allen's registration status after July, 1975, when § 4k became effective. Thus, Stotler "knew or should have known" that Allen was not registered, and § 4k made it unlawful for Stotler to remain associated with Allen without such registration.

Stotler also raises a more esoteric problem with regard to the Commission's imposing § 4k liability. Stotler claims that in 1977 and 1978, it was common in the industry for a trading advisor receiving commission rebates not to register as an associated person, and testimony introduced at the hearing supports this contention. Stotler argues in its appellate brief that the "entire action is an impermissible administrative enforcement substitute for required Commission rule-making." Stotler relies upon *Ford Motor Co. v. Federal Trade Commission*, 673 F.2d 1008, 1009 (9th Cir. 1981), *cert. denied*, 459 U.S. 999, 103 S.Ct. 358, 74 L.Ed.2d 394 (1982), where the Ninth Circuit required that an "agency ... proceed by rule-making [not by adjudication] if it seeks to change the law and establish rules of widespread application."

*Ford*'s holding, however, has been correctly rejected as "[n]ovel and provocative case law" in *Colorado Dept. of Social Services v. Dept. of Health and Human Services*, 585 F.Supp. 522, 525 (D.Colo.1984), *aff'd* 771 F.2d 1422 (10th Cir.1985), and persuasively criticized by Professor Davis in § 7:14 to *Administrative Law* (1982) and in Note, *Administrative Adjudication—A New Legal Standard for Its Use*, 58 Wash.L.Rev. 633 (1983). It is well set-

tled that "the choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency." *SEC v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); *see NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 293, 94 S.Ct. 1757, 1771, 40 L.Ed.2d 134 (1974).

While there was some evidence that the non-registration practice was accepted at the time, the Commission "has the power to act against one firm practicing an industry-wide illegal practice" and "must be accorded wide latitude in its enforcement strategy." *Encyclopedia Britannica Inc. v. FTC*, 605 F.2d 964, 974 (7th Cir.1979), *cert. denied*, 445 U.S. 934, 100 S.Ct. 1329, 63 L.Ed.2d 770 (1980). Section 4k expressly forbade a futures commission merchant from remaining associated with a person not registered as its associated person while functioning as an employee in soliciting customer orders. Section 4k's requirements were new—having become effective July 18, 1975—and some case had to be first; § 4k changed what was lawful, not the Commission.[4] The Commission did not suddenly change its views, and Stotler was on notice of the relatively succinct statutory requirements. *Cf. Stoller v. CFTC*, 834 F.2d 262, 265–66 (2d Cir.1987). In light of all of these circumstances, the Commission did not patently abuse its discretion in bringing an enforcement action against Stotler.

## IV. CONCLUSION

With these comments, and for the reasons set forth in the Commission's thorough opinion, we deny Stotler's petition for review and affirm the Commission's order.

AFFIRMED.

---

**4.** The Commission expressly recognized the statute's recent enactment, with its new registration provisions, in affirming the administrative law judge's imposing of a relatively modest punishment (ordering Stotler to cease and desist from violating Sections 4b, 4o, and 4k and to pay a $10,000 penalty). The Commission's enforcement division had sought a civil penalty of $100,000 for each violation of the Act and a suspension or revocation of Stotler's registration as a futures commission merchant.