**Benton W. BULLWINKEL,
Petitioner–Appellant,**

v.

**FEDERAL AVIATION ADMINISTRATION and National Transportation Safety Board, Respondents–Appellees.**

No. 93–1803.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 29, 1993.

Decided April 27, 1994.

As Amended on Denial of Rehearing June 23, 1994.

168

John T. Allen, Jr. (argued), Bullwinkel Partners, Chicago, IL, for petitioner.

James W. Tegtmeier (argued), F.A.A., Washington, DC, for F.A.A.

Daniel D. Campbell, Nat. Transp. Safety Bd., Office of Gen. Counsel, Washington, DC, for Nat. Transp. Safety Bd.

Before CUMMINGS and CUDAHY, Circuit Judges, and LEINENWEBER, District Judge.*

CUDAHY, Circuit Judge.

The Federal Aviation Administration ("FAA") has grounded Benton Bullwinkel. Claiming that the daily doses of lithium Mr. Bullwinkel takes to control his bipolar mood disorder (also known as manic depression)

* The Honorable Harry D. Leinenweber, District Judge for the Northern District of Illinois, is sitting by designation.

render him unfit to fly, the FAA has refused to renew his third-class airman's medical certificate—an essential requirement for obtaining a license to pilot private planes. Subsequent to this denial, Mr. Bullwinkel petitioned the National Transportation Safety Board ("NTSB" or "Board") for review of the FAA's determination. But despite a recommendation in Mr. Bullwinkel's favor by the administrative law judge assigned by the Board to conduct a hearing on his petition, the NTSB upheld the FAA's decision. Mr. Bullwinkel now appeals the NTSB's determination to this court. We have jurisdiction pursuant to 49 U.S.C. § 1486(a) and 49 U.S.C. § 1903(d). We vacate and remand the matter to the NTSB.

### The Statutory Framework

■ The Federal Aviation Act was enacted to promote air traffic safety. 49 U.S.C. § 1421(a); *Heller v. United States*, 803 F.2d 1558, 1559 (11th Cir.1986). The Act requires that pilots be "physically able to perform the duties" of their position. 49 U.S.C. § 1422(b)(1). Regulations promulgated pursuant to the Act compel prospective pilots to secure a restricted or unrestricted medical certificate in order to obtain a license. 14 C.F.R. § 61.3. Three classes of unrestricted medical certificates are issued: (1) a captain of commercial aircraft must obtain a first-class medical certificate (14 C.F.R. § 61.3(c)); (2) a co-pilot or flight engineer must obtain a second-class certificate (14 C.F.R. § 63.3(a)); and (3) a person, such as Mr. Bullwinkel, desiring only to pilot a private plane must obtain a third-class certificate (14 C.F.R. § 61.103(c)). Additionally, if an applicant is unable to secure an unrestricted medical certificate, the Federal Air Surgeon [1] may, in his discretion, issue the applicant a "special issue certificate" (14 C.F.R. § 67.19) containing "such terms, conditions, and limitations, as to duration thereof, [the need for] periodic or special examinations, tests of physical fitness, and other matters [the Federal Air Surgeon] may determine to be necessary to assure safety in air commerce." 49 U.S.C. § 1422(b)(1).

Mr. Bullwinkel, who sought a third-class certificate, was required to satisfy the conditions set out in 14 C.F.R. § 67.17. The validity of these regulations as "a permissible construction" of the Federal Aviation Act is not disputed. *Chevron, U.S.A. Inc. v. NRDC*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Bullwinkel rather claims that the Board's interpretation of those regulations is unreasonable.

### Mr. Bullwinkel's Application and the "No–Lithium" Rule

Mr. Bullwinkel made the application for renewal of his medical certificate here at issue in February 1991. He first received a medical certificate in 1987. Two years later, the certificate was renewed. Subsequent to the 1989 renewal, Mr. Bullwinkel began treatment for "concentration problems," and was placed on lithium to control his "mild mood swings." *Petition of Bullwinkel*, NTSB Order No. EA–3832, 1993 WL 87709, *1, 1993 NTSB Lexis 51, at *3 & n. 3. In February 1991 he applied for another renewal of his medical certificate and in this application he informed the FAA of the medical treatment he was receiving. In May 1992, the FAA, relying on 16 C.F.R. §§ 67.-17(d)(1)(ii) and (f)(2), denied the application "due to [his] history of mood swings, attention deficit disorder, and the use of disqualifying medication (lithium and Ritalin)" (R. 1). Mr. Bullwinkel requested reconsideration of the denial, but the FAA again refused to award a certificate, asserting that "the use of the medication Ritalin and Lithium is disqualifying for all classes of medical certification" (R. 7).[2] He then petitioned the NTSB for review. The NTSB assigned his petition to an administrative law judge to conduct a hearing.

Prior to the administrative hearing, Mr. Bullwinkel discontinued use of Ritalin, leaving his lithium use as the only issue at the hearing. Extensive evidence on the nature

---

1. The Secretary of Transportation has delegated his authority to examine applicants and issue medical certificates to the Federal Air Surgeon. 14 C.F.R. § 67.25.

2. Although Mr. Bullwinkel did not apply for a special issue certificate, the FAA *sua sponte* denied him such a certificate on the basis of information it then possessed (R. 7).

of bipolar disorders and treatment of such disorders with lithium was presented at the hearing. The evidence indicated that if left untreated, mild bipolar disorders could significantly impair one's ability to pilot an aircraft (R. 165), but that the adverse symptoms of the disorder could often be controlled by lithium (R. 149–150). The evidence also indicated, however, that, although lithium can often control the symptoms of bipolar disorder which would impair the ability to operate an aircraft, the drug does not eliminate all potential threats to aviation safety. First, lithium itself may pose a threat to air safety. Lithium levels in excess of the amount needed to control bipolar disorder are disabling and potentially fatal (R. 156–157). The symptoms of "lithium toxicity" include tremors, memory loss, loss of balance, blurred vision and other adverse physical reactions. Dehydration, such as that caused by a long flight, can cause a person's lithium level to drift upward, increasing the risk or severity of lithium toxicity (R. 161, 182–183, 248–250, 271–273). Second, testimony also established that a person whose bipolar disorder is being effectively controlled by lithium may nonetheless suffer an episode of the disorder (referred to as a "breakthrough"). Although 60% to 70% of persons treated with lithium "will be relatively symptom free for long periods of time," breakthroughs are "not uncommon" (R. 169–170) and might occur in Mr. Bullwinkel's case (R. 217–218). During a breakthrough, the symptoms of bipolar disorder that impair the ability to pilot an aircraft may return.

The expert witnesses agreed that given the possibility of lithium toxicity and breakthrough, persons treated with lithium should be regularly monitored by having their serum lithium levels tested at least every six months (R. 203, 210, 216, 220). However, although ordered by his doctor to submit to a serum lithium test after six months on the drug, Mr. Bullwinkel "didn't get around to it" (R. 203–204) until two weeks before the administrative hearing—about a year and three months after his initial serum level test (R. 204–205, 382–383).

In spite of the evidence outlining the dangers of lithium, the administrative law judge determined that Mr. Bullwinkel should not have been denied a medical certificate. This determination was based in large part on the deference the administrative law judge gave to the testimony of Mr. Bullwinkel's treating physician and expert witness, Dr. John Hanni. Dr. Hanni testified that although some people whose bipolar disorders were treated with lithium could pose an unacceptable risk to aviation safety, he believed that Mr. Bullwinkel himself would not pose such a threat. The administrative law judge concurred and held that Mr. Bullwinkel should be issued an unrestricted medical certificate.

The National Transportation Safety Board, however, disagreed.[3] Relying on evidence presented both by Dr. Hanni and by the FAA's medical expert as to the dangers of lithium use, the Board determined that the FAA's denial of Mr. Bullwinkel's unrestricted medical certificate was "prudent." *Petition of Bullwinkel*, 1993 WL 87709 at *3, at *8. The NTSB determined that given the risks associated with ingestion of lithium—the possibility of breakthrough and of lithium toxicity—periodic monitoring would be necessary to ensure that Mr. Bullwinkel could safely perform the duties of a private pilot. The NTSB concluded, however, that a requirement of periodic monitoring was inconsistent with the grant of an unrestricted medical certificate, which unlike a special issue certif-

---

**3.** The NTSB is not bound by the administrative law judge's determinations. *Dodson v. National Transportation Safety Board*, 644 F.2d 647, 651 (7th Cir.1981) (NTSB's determination is "vulnerable only if it fails to reflect an attentive consideration of the ALJ's decision"). On the other hand, where an agency rejects an ALJ's findings of fact, the findings of the ALJ are taken into account as part of the record in considering whether substantial evidence supports an agen-

cy's findings. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 492–97, 71 S.Ct. 456, 466–69, 95 L.Ed. 456 (1951). On appeal, Mr. Bullwinkel brings in part a substantial evidence challenge to the NTSB's determination. But the only "fact" on which the NTSB relied in denying Mr. Bullwinkel's application is the undisputed fact that he takes prescribed doses of lithium to treat his bi-polar disorder. His "substantial evidence" challenge therefore lacks merit.

icate does not allow for individualized terms and requirements.[4]

## Analysis

On appeal of the NTSB determination, Mr. Bullwinkel makes several claims of error. His primary argument challenges the "no-lithium" rule, claiming first that the Board cannot announce such a rule through adjudication and second that the rule is not a reasonable interpretation of the relevant agency regulation. Mr. Bullwinkel also claims that the denial of his medical certificate violates the Rehabilitation Act's prohibition on discrimination based on handicap. 29 U.S.C. § 701 *et seq.*

### Adjudication vs. Rulemaking

■ Mr. Bullwinkel claims that the "no-lithium" rule has impermissibly been announced through adjudication. As he puts it, the "use of lithium is nowhere proscribed by the [published regulations]. It is merely the FAA's unpublished 'policy.'" Br. at 13. Although Mr. Bullwinkel is correct that agencies may not enforce unpublished policies, *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974), the determination here at issue was not made pursuant to a secret policy, but was rather legitimately developed through agency adjudication.

■ As long as the rule represents a permissible interpretation of the relevant regulation (a question we take up next), announcing such a rule through agency adjudication is a valid—and published—expression of agency policy. As the case law makes clear, an agency's adjudicative process is an appropriate forum for determining the scope of regulations and for articulating agency policy. *See NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 293, 94 S.Ct. 1757, 1771, 40 L.Ed.2d

134 (1974) (choice between announcing policy through rulemaking or adjudication is in agency's discretion); *SEC v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947) (*"Chenery II"*) ("[T]he choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."); *Federal Trade Comm'n v. R.F. Keppel & Bro., Inc.,* 291 U.S. 304, 312, 54 S.Ct. 423, 426, 78 L.Ed. 814 (1934); *Davidson v. New Orleans,* 96 U.S. (6 Otto) 97, 24 L.Ed. 616 (1878); *Stotler & Co. v. Commodities Futures Trading Comm'n,* 855 F.2d 1288, 1294–1295 (7th Cir. 1988); *United States v. Markgraf,* 736 F.2d 1179, 1185 (7th Cir.1984) ("It is a fundamental principle of administrative law that the choice between rule making and adjudication is one primarily for the discretion of the agency."); *Encyclopaedia Britannica v. Federal Trade Comm'n,* 605 F.2d 964, 973 (7th Cir.1979).[5] Given this discretion, the NTSB could legitimately choose to announce such a rule through adjudication.

And that is exactly what it has done. In a series of decisions, the NTSB has interpreted the relevant regulations as requiring that persons taking medications such as lithium be denied unrestricted medical certificates. *See, e.g., Petition of Bruckner,* NTSB Order No. EA–3262, 1991 WL 321214, 1991 NTSB Lexis 123; *Petition of Rose,* 1991 WL 320029; *Petition of Doe,* NTSB Order No. EA–2122, 1985 WL 71830, 1985 NTSB Lexis 218. The question is therefore whether the "no-lithium" rule is a permissible interpretation of the FAA's regulations.

### The Reasonableness of the "No–Lithium" Rule

■ The "no-lithium" rule, according to the NTSB's decisions in which it has been

---

**4.** The NTSB did not review the FAA's *sua sponte* denial of Mr. Bullwinkel's special issue certificate. The NTSB has determined that its power to review FAA determinations does not include the power to review the FAA's exercise of its discretionary certification authority. *Petition of Rose,* NTSB Order No. EA–3260, 1991 WL 320029, at *2, 1991 NTSB Lexis 16, at *5 n. 5 ("the [NTSB] cannot order the placement of conditions or limitations upon any· medical certificate, nor does the [NTSB] have jurisdiction to review the issuance or denial of special issuance medical certificates").

**5.** In *Morton v. Ruiz,* the Supreme Court held that the Bureau of Indian Affairs could not enforce a policy contained only in an internal agency manual and required the Bureau to publish a valid legislative rule in order to avoid the appearance of arbitrariness. No agency adjudication was involved. 415 U.S. at 235–236, 94 S.Ct. at 1074–1075. Here the NTSB determination rests not on a policy kept from the public, but on an interpretation, developed through a series of publicly available adjudicative decisions.

promulgated, *see Petition of Bruckner*, 1991 WL 321214, is an interpretation of 14 C.F.R. § 67.17(f). Section 67.17 governs eligibility for third-class medical certificates. Paragraph (a) of that section provides that to be eligible for a certificate, an applicant "must meet the requirements of paragraphs (b) through (f) of this section." 14 C.F.R. § 67.-17(a). Paragraphs (b) through (e) respectively set out requirements for an applicant's eyes; ears, nose, throat and equilibrium; mental and neurologic condition; and cardiovascular condition. 14 C.F.R. § 67.17(b)–(e). Paragraph (f), of which the "no-lithium" rule is an interpretation, is a catch-all. An applicant cannot receive a medical certificate if he suffers from any "other organic, functional or structural disease, defect, or limitation that the Federal Air Surgeon finds (i) [m]akes the applicant unable to safely perform the duties or exercise the privileges of the airman certificate that he holds or for which he is applying, or (ii) [m]ay reasonably be expected, within two years after the finding, to make him unable to perform those duties or exercise those privileges." 14 C.F.R. § 67.-17(f)(2).

■ The question then is whether the "no-lithium" rule is a permissible interpretation of this language. We owe great deference to the NTSB's interpretation of the FAA regulation. In fact, we may hold the rule invalid only if it is plainly erroneous or inconsistent with the applicable regulation. *Stinson v. United States*, — U.S. —, —, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993) (courts should defer to agency interpretation unless it is clearly erroneous); *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 150, 111 S.Ct. 1171, 1175, 113 L.Ed.2d 117 (1991) (interpretations promulgated through adjudication are entitled to deference).

Underlying this broad deference is a realization that to reject too lightly plausible adjudicative interpretations of regulations would require agencies to promulgate new rules whenever confronted by cases not definitively covered by existing regulations: it is settled law, however, that agencies may in such circumstances determine the scope of the applicable regulations through adjudication, *cf. Bell Aerospace Co.*, 416 U.S. at 293, 94 S.Ct. at 1771, and need not promulgate new rules.

But even given the broad deference that we must accord agency interpretations, we are constrained to reject the NTSB's interpretation here. Even a cursory glance at § 67.17 makes it clear that this regulation is aimed at underlying medical conditions, not medications. Paragraphs (b) through (e) enumerate a number of disqualifying *conditions*, all of which can be described as "organic, functional or structural disease[s], defect[s], or limitation[s]." Paragraph (f), the catch-all, is entitled "general medical condition." It provides that the Federal Air Surgeon can add any "*other* organic, functional or structural disease, defect, or limitation" (emphasis supplied). The "no-lithium" rule, however, addresses a *medication*, not an underlying condition. One of the problems with the rule is that it may suggest that bipolar disorder treated with lithium may be less acceptable than untreated bi-polar disorder.

The no-lithium rule can be understood in two ways, reflecting either a concern with (1) the underlying condition (bi-polar disorder) that the lithium is being used to treat, or (2) with the use of lithium itself. Both of these theories have some support in the Board's decisions, and they are both urged upon us here by the NTSB. *See SEC v. Chenery Corp.*, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943) (*Chenery I*) (agency action can be upheld only on grounds asserted by the agency). But because neither of these offered explanations represents a reasonable interpretation of the agency regulation, we are constrained to remand this matter to the NTSB for further consideration.

The first argument made on behalf of the "no-lithium" rule is that it is a proxy for denying licenses to those who suffer from bipolar disorder. This is the only way to make sense of the Board's concern about the likelihood of "breakthrough," as well as the discussion in the NTSB's decisions that focuses on an applicant's bipolar disorder rather than on his use of lithium. *See Petition of Doe*, 1985 WL 71830 at *1, 1985 NTSB Lexis 218 at *2–3 ("the Board finds that the petitioner

has failed to establish that he is qualified for an unlimited airman medical certificate because he has a major affective disorder"); *Petition of Rose*, 1991 WL 320029 at *1, 1991 NTSB Lexis 16 at *1 ("The Federal Air Surgeon [determined] that petitioner was disqualified for airman medical certification because petitioner's FAA medical records revealed that Petitioner had a history of bipolar disorder.") In fact, insofar as the Board cites to 14 C.F.R. § 67.17(d) (which is concerned with mental and neurological disorders) as authority for the no-lithium rule, *see Petition of Bruckner*, 1991 WL 321214; *Petition of Rose*, 1991 WL 320029, it essentially admits that it is concerned not with lithium *per se* but rather with the underlying bi-polar disorder.

Of course, were the Board to announce that bi-polar disorder was a disqualifying condition, such a rule would almost certainly be a permissible interpretation of the applicable regulation (particularly § 67.17(d)). But if the Board is concerned that the effects of bi-polar disorder make Bullwinkel unable to fly, grounding him because he takes lithium (which is a way of treating and controlling those effects) strikes us as incongruous. On this view, Bullwinkel would apparently be entitled to his third-class certificate if he would only stop taking the medication that he uses to treat his underlying bi-polar disorder, since manic-depressives who leave their illness untreated are of course unaffected by the "no-lithium" rule. This approach cannot be said to be a reasonable interpretation of the regulation.

Nor are we the first to harbor this concern with the FAA's cart-before-the-horse practice:

> The regulatory standards do not address the subject of medication and do not provide for disqualification of individuals from certification based on prescription of medication by their physicians. Yet, the FAA continues to regularly refuse to issue aviation medical certificates based on the applicant's use of a "disqualifying medication," while readily admitting that there is really no such thing.... It appears that what the FAA is really trying to do in these cases is to diagnose the underlying physi-

cal condition from the medication prescribed. In no other situation is this considered acceptable medical logic. This whole area of "disqualifying medication" has created a quagmire of illogical thinking which undermines the FAA's medical credibility.

J. Scott Hamilton, *Medical Certification of Flight Crews: Standards and Procedures*, 13 Transp.L.J. 103, 114 (1983) (footnotes omitted). In light of all of this, we are constrained to conclude that the NTSB's "no-lithium" rule, insofar as it is an attempt to weed out manic-depressives, is not a rational interpretation of the regulation.

The FAA's "no-lithium" rule could alternatively be understood to aim not at the underlying condition (the bi-polar disorder) by the roundabout route of the medication, but rather to reflect a concern in the first instance with the use of the medication, and the possibility that those who are taking lithium might suffer from "lithium toxicity," whose symptoms—tremors, memory loss, loss of balance and blurred vision—might render an applicant unable safely to perform the duties of a pilot. Indeed, there is some suggestion that this is the concern that also animates the "no-lithium" rule. Thus, in denying Bullwinkel's application, the Board noted that there "are certain risks associated with the ingestion of lithium," including "confusion, lethargy, blurred vision, ataxia, and problems with balance." *Petition of Bullwinkel*, 1993 WL 87709 at *2, 1993 NTSB Lexis 51 at *8.

But while these concerns appear to us to be eminently reasonable, they do not jibe with the language of the regulation, which focuses on "organic, functional or structural disease[s], defect[s] or limitation[s]." This language, read in its context, is clearly and unambiguously concerned with *underlying conditions*, not with medications. Despite the deference we owe the agency interpretation, we simply cannot fit "the use of lithium" into any of the categories spelled out in the regulation.

This is of course not to say that those who are taking lithium to treat their bi-polar disorder ought to be able to pilot airplanes. Rather, on remand, the NTSB—insofar as it

is concerned with bi-polar disorder—could surely conclude that this underlying condition is a "personality disorder, neurosis, or mental condition" that renders an applicant unable safely to pilot an aircraft (except possibly under certain specified conditions). 14 C.F.R. § 67.17(d)(ii). Alternatively, if the FAA is in fact concerned in the first instance about the use of lithium (rather than the bipolar disorder), it obviously could amend its regulations to permit the disqualification of applicants based on their use of a prohibited medication.

### Rehabilitation Act

Finally, Mr. Bullwinkel argues that denial of his unrestricted medical certificate on the basis of his use of lithium violates the Rehabilitation Act (29 U.S.C. § 701 *et seq.*), which prohibits discrimination against otherwise qualified individuals on the basis of a handicap. But in light of our decision to remand the matter to the NTSB on the grounds above, we have no occasion now to reach this argument.

### Conclusion

Because we find that the "no-lithium" rule is not a reasonable interpretation of the Federal Aviation Regulations as they are currently formulated, we VACATE the NTSB's denial of Mr. Bullwinkel's application for a third-class medical certificate, and REMAND the matter to the Board for further consideration in accordance with this opinion.

CUMMINGS, Circuit Judge, dissenting.

I dissent because the majority is splitting hairs in condemning the no lithium rule. Obviously, the rule is aimed at two conditions: (1) the taker of prescribed lithium is given the medication because otherwise he or she is apt to suffer the disabling symptoms for which it is given and (2) the lithium itself can cause side effects that make the user disqualified to fly. It is simply pettifogging to remand this case to the Board since serious accidents may occur while the Board reconsiders the rule: it is obvious that the result will be the same, even though the rule will be

recouched to satisfy the majority opinion. The Board should not be forced to redraft a rule which is already designed to prevent aircraft tragedies merely to satisfy this Court's sensibilities.